IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMSC-016

Filing Date: April 12, 2011

Docket No. 31,105

STATE OF NEW MEXICO,

       Plaintiff-Appellee,

v.

JEREMIAH KENNETH DOWLING,

       Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY
Stephen Bridgforth, District Judge

Hugh W. Dangler, Chief Public Defender
Vicki W. Zelle, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
M. Victoria Wilson, Assistant Attorney General
Santa Fe, NM

for Appellee

OPINION

CHÁVEZ, Justice.

{1}     In this case, we revisit depraved mind murder involving a motorist. Over the course of seven-tenths of a mile, the 18-year-old Defendant drove his truck at speeds estimated to approach 80 miles per hour on a four-lane suburban street during the middle of a weekday, striking and injuring a jogger on the street's raised median, then driving onto a sidewalk and striking and killing a second pedestrian; all the while speeding and weaving in and out of traffic, including into oncoming traffic, until crossing all four lanes of the street and ultimately crashing into a boulder on the raised median. Because the jury found that

1

Defendant struck the first pedestrian with the intent to injure her, it found him guilty of aggravated battery with a deadly weapon, contrary to NMSA 1978, Section 30-3-5 (1969). Defendant was also convicted of first degree depraved mind murder, contrary to NMSA 1978, Section 30-2-1(A)(3) (1994); leaving the scene of an accident not resulting in great bodily harm, contrary to NMSA 1978, Section 66-7-201(D) (1989); knowingly leaving the scene of an accident resulting in great bodily harm, contrary to Section 66-7-201(C); reckless driving, contrary to NMSA 1978, Section 66-8-113 (1987); and escape or attempt to escape from jail, contrary to NMSA 1978, Section 30-22-8 (1963).

{2}     There is only one prior New Mexico case that addresses depraved mind murder in the context of a homicide caused by a motorist. *State v. Ibn Omar-Muhammad*, 102 N.M. 274, 278, 694 P.2d 922, 926 (1985), *holding modified on other grounds by State v. Cleve*, 1999-NMSC-017, ¶ 27, 127 N.M. 240, 980 P.2d 23. In *Omar-Muhammad* we made it clear that mere reckless driving is insufficient to support a depraved mind murder conviction. Instead, extremely reckless conduct evidencing indifference for the value of human life is required. In this case, we must decide whether the jury was properly instructed and whether Defendant's driving behavior constitutes sufficient evidence to support a depraved mind murder conviction. We conclude (1) that the jury was improperly instructed by the trial court to consider only reckless and not "extremely reckless" driving, and (2) that double jeopardy does not bar Defendant's retrial because sufficient evidence supports the jury verdict.

{3}     Our conclusions in this case should not be construed by prosecutors as a broad license to bring depraved mind murder charges whenever the State seeks to convict a motorist for homicide. As we set forth in the body of this Opinion, this case involves extraordinary facts that permit the rare inference of a depraved mind in the context of a vehicular killing. As we have made clear in the past and reiterate here, the depraved mind doctrine is to be applied sparingly, regardless of the circumstances. However, this admonition is especially resonant where the lethal instrumentality is an automobile and the jury is provided only circumstantial evidence from which to infer the presence of a depraved mind.

## I.     BACKGROUND

{4}     During the middle of the day, Defendant was driving a truck southbound on a four-lane roadway divided by a raised dirt-filled median surrounded by concrete curbing. Witnesses saw Defendant drive up onto the median and accelerate straight toward a jogger, striking her with the truck's large exterior mirror. After striking the jogger, Defendant continued driving southbound for approximately seven-tenths of a mile at speeds estimated to be more than twice the posted speed limit of 35 miles per hour. At one point Defendant was observed driving up onto the median to pass vehicles occupying both southbound lanes. On at least two other occasions, Defendant drove over the raised median into oncoming northbound traffic and then crossed the median back onto the southbound lanes, almost colliding with other motorists on both sides of the median. In addition to weaving between

2

the north and southbound lanes of the road, Defendant crossed the two southbound lanes, climbed the sidewalk to the west, and struck a pedestrian with such force that "almost all" of the victim's internal organs were severely injured, causing numerous fractures including a broken neck, and resulting in victim's brain being dislodged from her skull. She died at the scene.

**{5}** Defendant continued driving recklessly and crossed the raised median one more time, once again driving the wrong way in the northbound lanes. Defendant then swerved out of the path of an oncoming car, narrowly avoiding a collision, and crashed into a boulder on the median between the north and southbound lanes. His truck disabled, Defendant fled on foot and was later captured about one mile away. Further facts will be developed as needed in the body of this Opinion.

**{6}** Defendant appeals only his conviction for depraved mind murder.[1] In the table of contents of his brief in chief, Defendant raises one main issue: whether sufficient evidence supports the depraved mind murder conviction. However, in stealth fashion, Defendant also raises two other issues in the body of the brief: (1) whether the trial court erred in its instruction to the jury on depraved mind murder because "[t]he given jury instructions did not clearly explain that to convict of first degree depraved mind murder there must be much more than simply establishing that reckless conduct caused the death of a person," and (2) whether three isolated statements made by the prosecution improperly inflamed the jury's passions, thereby encouraging them to convict Defendant of depraved mind murder instead of vehicular homicide.

**{7}** With respect to the sufficiency of the evidence challenge, we interpret Defendant's brief to ask us to review whether a rational jury could find the following three elements of depraved mind murder: (1) whether Defendant had "subjective knowledge that his [driving] was greatly dangerous to the lives of others," *State v. Reed*, 2005-NMSC-031, ¶ 23, 138 N.M. 365, 120 P.3d 447 (internal quotation marks and citation omitted); (2) whether Defendant's driving was "dangerous to more than one person," *id.* ¶ 22; and (3) whether Defendant's driving indicated "a depraved mind without regard for human life." UJI 14-203 NMRA. After viewing the evidence in the light most favorable to the prosecution, we conclude as a matter of law that any rational juror as instructed could have found the essential elements of the crime beyond a reasonable doubt. *See State v. Rosaire,* 1996-NMCA-115, ¶ 21, 123 N.M. 250, 939 P.2d 597. However, we also conclude that the jury in this case was not properly instructed because the given instruction incorrectly stated that a finding of mere reckless driving was adequate to find Defendant guilty of depraved mind

---

[1]Because the Defendant received a life sentence, we review this case as a direct appeal pursuant to the Court's jurisdiction under Article VI, Section 2 of the New Mexico Constitution, as codified per Rule 12-102(A)(1) NMRA. *See State v. Smallwood*, 2007-NMSC-005, ¶ 6, 141 N.M. 178, 152 P.3d 821 ("our appellate jurisdiction extends to appeals from district court judgments imposing a sentence of life imprisonment or death").

murder. Accordingly, we reverse and remand this matter for a new trial on the depraved mind murder charge. Because of our holding, we do not address the three isolated remarks made by the prosecution to which Defendant made no objection.

## II.    DEPRAVED MIND MURDER IN NEW MEXICO

**{8}**    New Mexico law defines "depraved mind murder" as an unintentional first degree killing caused "by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life." Section 30-2-1(A)(3). First degree murder is a capital felony. *Id.* Accordingly, a defendant convicted of first degree murder is subject to a mandatory term of life imprisonment. NMSA 1978, § 31-18-14 (1993).

**{9}**    New Mexico is one of only three states to classify depraved mind murder in the first degree. Other jurisdictions typically classify depraved mind killings in the second degree, reserving the first degree designation for killings characterized by some indicia of premeditation and deliberation. *See* 2 Wayne R. LaFave & David C. Baum, *Substantive Criminal Law* § 14.7 (2d ed. 2003); *see also State v. Lacquey*, 571 P.2d 1027, 1030 (Ariz. 1977) (in banc) ("That this crime was brutal there can be no doubt, but brutality alone cannot, in itself, support a finding of premeditation and deliberation."). Only Colorado and Washington join New Mexico in classifying depraved mind killings in the first degree. Colo. Rev. Stat. § 18-3-102(1)(d) (2000); Wash. Rev. Code § 9A.32.030(1)(b) (1990). Because first degree murder is subject to our most serious criminal sanction, we have repeatedly emphasized the importance of ensuring that only the most "heinous and reprehensible" killings fall under the depraved mind category. *See State v. Garcia,* 114 N.M. 269, 272, 837 P.2d 862, 865 (1992); *see also Reed*, 2005-NMSC-031, ¶ 17; *State v. Brown,* 1996-NMSC-073, ¶ 15, 122 N.M. 724, 931 P.2d 69.

**{10}**    To that end, this Court has recognized a number of elements to be considered in appraising whether a defendant has displayed the requisite depraved mind pursuant to Section 30-2-1(A)(3). *Reed*, 2005-NMSC-031, ¶¶ 22-24. Our development of these criteria is directed by the plain language of the statute and the recognition that the Legislature intends only the most reprehensible unintentional homicides to be classified in the first degree, clearly distinct from homicides that warrant punishment as second degree murder. *Reed*, 2005-NMSC-031, ¶¶ 17, 36; *Brown*, 1996-NMSC-073, ¶ 13. Thus, we have developed these elements for the express purpose of limiting the application of depraved mind murder to only those rare unintentional murders that warrant the first degree murder punishment. *See Reed*, 2005-NMSC-031, ¶¶ 24, 25 ("[D]epraved mind murder . . . is not a fallback position available whenever the State fails to prove deliberation.").

**{11}**    First, as directed by Section 30-2-1(A)(3), we require that more than one person be endangered by the defendant's act. This element conforms to the statute's plain language, which requires "any act greatly dangerous to the *lives of others*." *Id.* (emphasis added); *State v. DeSantos*, 89 N.M. 458, 461, 553 P.2d 1265, 1268 (1976) (holding that a depraved mind instruction was improper because defendant's actions were only dangerous to one person).

4

Second, we require that the defendant's act be intentional and of an extremely reckless character. *Reed,* 2005-NMSC-031, ¶¶ 17, 25 ("[T]he accused must subjectively intend to commit an act that has a great likelihood of resulting in death."). Mere recklessness will not suffice for a depraved mind murder conviction. *Id.* ¶ 43. Third, we require that the defendant possess subjective knowledge that his act was "greatly dangerous to the lives of others." *State v. McCrary*, 100 N.M. 671, 672-73, 675 P.2d 120, 121-22 (1984). By imposing this mens rea standard, we ensure that only an actor who was aware of the extremely reckless nature of his conduct can be held to account for first degree murder. Fourth and finally, we require that the act "encompass an intensified malice or evil intent." *Brown*, 1996-NMSC-073, ¶ 15. This concept further differentiates between killings characterized by a "depraved mind" versus less reprehensible killings. *Id*. ("Because the legislature has deemed that a killing performed with a depraved mind is an especially serious homicide, deserving of punishment equal to that imposed for other forms of first-degree murder, we conclude that the legislature intended the offense of depraved mind murder to encompass an intensified malice or evil intent."); *see generally* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 60 (3d. ed. 1982) (identifying the presence of "viciousness–an extreme indifference to the value of human life" as a characteristic key to distinguishing unintentional killings constituting murder versus manslaughter).

## III.    ANALYSIS

## A.    THE DEPRAVED MIND JURY INSTRUCTION

**Because the Depraved Mind Jury Instruction Given at Trial Misstated the Law and Misdirected the Jury, We Reverse Defendant's Depraved Mind Conviction.**

**{12}** We first address Defendant's roundabout challenge to the jury instruction provided at trial. In the midst of his argument regarding sufficiency of the evidence, Defendant raises concerns over the definition of the depraved mind act included in the instruction. Among other things, Defendant complains that "[t]he given jury instruction[] did not clearly explain that to convict of first degree depraved mind murder there must be much more than simply establishing that reckless conduct caused the death of a person." Defendant contends that the State must prove, inter alia, that "the [depraved mind] act showed a most extreme level of recklessness."

**{13}** In this case, to find Defendant guilty of first degree murder, the jury was instructed that it must find:

1.    The defendant drove his vehicle erratically and recklessly for a long distance on Roadrunner Parkway striking Andrea Thomas [the jogger] and Sharon McNair [the pedestrian];

2.    The defendant's act caused the death of Sharon McNair;

5

3.    The act of the defendant was greatly dangerous to the lives of others, indicating a depraved mind without regard for human life;

4.    The defendant knew that his act was greatly dangerous to the lives of others;

5.    This happened in New Mexico on or about the 21st day of December, 2005.

**{14}**    Defendant's challenge focuses on the instruction's first paragraph, which defines Defendant's alleged depraved mind act. During the trial, Defendant submitted an alternate instruction to the trial court proposing different language for that paragraph, namely: "The defendant drove his vehicle in an extremely reckless manner." The trial court rejected Defendant's proffered instruction, electing to omit the "extremely" modifier and instead incorporate a more extensive description of the act without any adverb preceding "recklessly." Because Defendant preserved the issue by offering an alternate instruction, we review Defendant's claim for reversible error. *State v. Ellis*, 2008-NMSC-032, ¶ 14, 144 N.M. 253, 186 P.3d 245 ("When, as in this case, a challenge to the jury instructions has been preserved, we review for reversible error."). "A jury instruction which does not instruct the jury upon all questions of law essential for a conviction of any crime submitted to the jury is reversible error." *State v. Parish*, 118 N.M. 39, 44, 878 P.2d 988, 993 (1994).

**{15}**    We conclude that the trial court's failure to clarify the extent of the recklessness required to find a depraved mind constitutes error. We have consistently held that "mere . . . recklessness" is not enough. *Reed*, 2005-NMSC-031, ¶ 23. *See, e.g., id.* ¶ 24 ("Depraved mind murder, therefore, requires outrageously reckless conduct. . . ."); *Brown*, 1996-NMSC-073, ¶ 15; *State v. Johnson*, 103 N.M. 364, 368, 707 P.2d 1174, 1178 (Ct. App. 1985). In *Reed*, we even exhorted the UJI Criminal Committee to amend the instruction to help juries better "understand the function of the phrase 'depraved mind.'" 2005-NMSC-031, ¶ 46. In 2009, this resulted in a fleshed-out standard whereby only "outrageously reckless conduct" resulting in death rises to the level of a depraved mind. UJI 14-203 NMRA. The additional 2009 language follows.

A person acts with a depraved mind by intentionally engaging in outrageously reckless conduct with a depraved kind of wantonness or total indifference for the value of human life. Mere negligence or recklessness is not enough. In addition, the defendant must have a corrupt, perverted, or malicious state of mind, such as when a person acts with ill will, hatred, spite, or evil intent.

*Id.* While this new language was not in effect at the time of Defendant's trial, *Reed* was published more than a year and a half earlier, putting the court and litigants on notice that "mere recklessness" was not an adequate standard.

**{16}** In our only prior opinion to address depraved mind murder in the context of a homicide caused by an automobile driver, published years before *Reed*, we similarly stated that "[d]epraved mind murder requires extremely reckless conduct evidencing indifference for the value of human life." *Omar-Muhammad*, 102 N.M. at 278, 694 P.2d at 926.[2] Therefore, at the time of Defendant's trial in April 2007, the omission of the term "extremely" misstated the law to the jury.

**{17}** However, the trial court's error does not warrant reversal unless the erroneous instruction "misdirected" or "confused" jurors. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (internal quotation marks omitted). We conclude that it did. When a jury instruction is facially erroneous, as when it directs the jury to find guilt based upon a misstatement of the law, a finding of juror misdirection is unavoidable. *See Parish*, 118 N.M. at 41, 878 P.2d at 990. Because no modifier for the term "recklessness" was included in the given instruction, "we have no way of knowing . . . whether the conviction was or was not on the basis" that the act was "extremely" reckless. *State v. Osborne*, 111 N.M. 654, 663, 808 P.2d 624, 633 (1991). As a result, we are left with no alternative but to reverse the depraved mind conviction. *See Parish*, 118 N.M. at 41, 878 P.2d at 990 ("if an instruction is facially erroneous it presents an incurable problem and mandates reversal").

## B.    SUFFICIENCY OF THE EVIDENCE

**{18}** Having determined that the defective jury instruction mandates reversal, we now consider Defendant's sufficiency of the evidence claim. We undertake this inquiry to ascertain whether double jeopardy protections are implicated by retrying Defendant. *See State v. Mascareñas*, 2000-NMSC-017, ¶ 31, 129 N.M. 230, 4 P.3d 1221. If we find that sufficient evidence was presented at trial to support a conviction, then retrial is not barred. *Rosaire*, 1996-NMCA-115, ¶ 20. We review Defendant's claim under the erroneous instruction provided to the jury at trial. *Id*.

**{19}** Defendant argues that his conduct simply did not meet the standard of first degree depraved mind murder. In particular, Defendant contends that he lacked the required subjective knowledge of the dangerousness of his conduct to support a depraved mind murder conviction. We focus primarily on that element and consider it first, but we also analyze whether more than one person was endangered by Defendant's conduct and whether Defendant demonstrated "a depraved mind without regard for human life."

**{20}** We review sufficiency of the evidence on appeal from a highly deferential standpoint. The Court must determine "whether substantial evidence of either a direct or

_____

[2]Our holdings requiring a finding of extreme recklessness are reflected in the 2009 amendments to the depraved mind uniform jury instruction. UJI 14-203 NMRA. Under the instruction, a person "acts with a depraved mind by intentionally engaging in outrageously reckless conduct. . . ." *Id*.

circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988); *Reed*, 2005-NMSC-031, ¶ 14. The evidence is to be viewed in the light most favorable to the State, resolving all conflicts and making all permissible inferences in favor of the jury's verdict. *Sutphin,* 107 N.M. at 131, 753 P.2d at 1319. It is our duty to determine whether any rational jury could have found the essential facts to establish each element of the crime beyond a reasonable doubt. *Garcia*, 114 N.M. at 274, 837 P.2d at 867. Thus, the Court must scrutinize the evidence and review the jury's fact-finding function to ensure that a rational jury could have found the facts required for each element of the conviction beyond a reasonable doubt. *Id.*; *State v. Orgain*, 115 N.M. 123, 126, 847 P.2d 1377, 1380 (Ct. App. 1993) ("[O]ur review involves a two-step process: deference to the resolution of factual conflicts and inferences derived therefrom, and a legal determination of whether the evidence viewed in this manner could support the conviction.").

1. **Sufficient Evidence Supports the Jury's Finding that Defendant Possessed Subjective Knowledge that His Conduct Was "Greatly Dangerous to the Lives of Others."**

**{21}** The mens rea standard is of paramount consideration in depraved mind murder analysis. *Brown*, 1996-NMSC-073, ¶ 15 ("[T]he difference in culpable mental states [between depraved mind murder and lesser unintentional homicides] is crucial in justifying the more serious penal consequences of first-degree murder."). Because depraved mind murder is unintentional, demonstrating the requisite mental state serves to establish that the defendant's underlying dangerous conduct was intentional and that his behavior exposed victims to mortal danger. Only a defendant who acts with such conscious disregard for the welfare of others warrants a depraved mind murder conviction. Thus, subjective knowledge of the risk introduced by the defendant "serves as proof that the defendant acted with a 'depraved mind' . . . with utter disregard for human life," thereby justifying imposition of a first degree murder conviction. *Id.* ¶ 16.

**{22}** We have observed that a defendant will rarely concede subjective knowledge of the danger his conduct posed to others. *McCrary*, 100 N.M. at 673, 675 P.2d at 122 ("[T]he element of intent is seldom susceptible to direct proof and accordingly may be proved by circumstantial evidence."). As a result, it is often the jury's task to glean subjective knowledge from the circumstances of the defendant's act. *Id.* As we have stated previously, the jury must determine "what the defendant should realize to be the degree of risk, in the light of the surrounding circumstances which [the defendant] knows." *Id.* (internal quotation marks and citation omitted). In many instances where a depraved mind murder charge is viable, this inquiry will be reasonably straightforward, such as acts of terrorism or drive-by shootings. *See Reed*, 2005-NMSC-031, ¶ 31; *see also Johnson*, 103 N.M. at 368, 707 P.2d at 1178; 2 LaFave, *supra*, § 14.4(a) at 440-41. It is only under unusual circumstances, such as where the defendant's conduct and circumstances give rise to multiple viable inferences or the defendant is mentally impaired, that determining his or her awareness becomes

8

difficult. *See, e.g., Brown*, 1996-NMSC-073, ¶ 35 ("We hold that, when the crime charged is depraved mind murder, evidence of intoxication may be taken into consideration by the jury when determining the existence of the required *mens rea* of 'subjective knowledge.'"); *see generally* 2 LaFave, *supra*, §14.4(b) at 443 ("No doubt most depraved-heart murder cases do not require a determination of the issue of whether the defendant was aware of the risk entailed by his conduct; his conduct was very risky and he himself was reasonable enough to know it to be so.").

{23}    When the defendant disputes the presence of subjective knowledge, New Mexico jurisprudence demonstrates that such knowledge may only be inferred from "substantial" evidence. *See Reed*, 2005-NMSC-031, ¶ 35. Such indicia of subjective knowledge has often come in the form of a defendant's actions. In *McCrary*, for example, the defendants claimed that their late-night shooting spree to avenge their grudge against carnival operators was only intended to puncture the tires of the carnival's vehicles. 100 N.M. at 673, 675 P.2d at 122. However, indisputable physical evidence revealed that every shot the defendants fired was directed at the passenger compartments of the carnival's vehicles, which permitted the jury to disregard their contradictory testimony and rationally infer depraved mind conduct. *Id*.

{24}    We have also permitted an inference of subjective knowledge where a defendant's depraved mind act arises out of personal animus. *Reed*, 2005-NMSC-031, ¶ 34. New Mexico is not alone in relying on some indicia of animosity on a defendant's part to establish the presence of a depraved mind. In at least one other jurisdiction, for example, a jury must find that the defendant harbored "ill will, hatred, spite or an evil intent toward or directed at his eventual victim" to sustain a depraved mind conviction. *Hicks v. State*, 41 So. 3d 327, 330 (Fla. Dist. Ct. App. 2010) (internal quotation marks and citation omitted); Fla. Std. Jury Instr. (Crim.) 98. Our reliance on the animosity factor is illustrated by cases such as *McCrary, State v. Trujillo*, 2002-NMSC-005, 131 N.M. 709, 42 P.3d 814, and *State v. Sena*, 99 N.M. 272, 657 P.2d 128 (1983). In *McCrary*, a defendant's animosity arose from a slight he perceived at the hands of carnival concessionaires. The defendant in question even admitted that his shooting spree constituted an act of revenge. 100 N.M. at 672, 673, 675 P.2d at 121, 122. In *Trujillo*, the defendant and his fellow gang members fired shots into a group of rival gang members after the two groups engaged in an argument. 2002-NMSC-005, ¶ 3. In *Sena*, the defendant fired into a crowded bar after being maced and ejected from the bar by the doorman. 99 N.M. at 273, 657 P.2d at 129. In all of these instances, the jury had access to straightforward evidence of the defendant's animosity to support a finding of subjective knowledge.

{25}    A unifying characteristic among these three New Mexico cases is the presence of a basis beyond the depraved act itself that lends substantial support to infer the presence of subjective knowledge. In each instance, the jury could rely upon some direct indicia of subjective knowledge that confirmed the defendant's personal desire to undertake acts that gave rise to dangerous circumstances. In such situations, it is evident that the very design of the defendant's conduct is to frighten or injure someone by exposing others to dangerous acts, thereby permitting a clear inference of subjective knowledge.

9

**{26}** No such external basis for subjective knowledge exists in this case. Defendant never made any statement regarding his actions that was presented at trial and he did not testify. In addition, little persuasive evidence was proffered to support a conclusion that Defendant's conduct arose out of personal animus. To the contrary, the testimony adduced at trial portrayed a defendant who demonstrated little in the way of any angry or hostile emotions before, during, or after the events at issue in these proceedings. Defendant's father, who housed and employed Defendant, spent the entire morning with him and blandly observed that Defendant was "fine . . . maybe a little tired" and had performed his normal duties at the shop, assisting with brake jobs and oil changes. Likewise, when apprehended by law enforcement, an officer testified that Defendant didn't display "any emotion . . . at all." Several hours after Defendant's arrest, one officer observed that Defendant "could not sit still, couldn't stop moving, as if [his behavior] was uncontrolled." However, even this odd behavior does not indicate the presence of any animosity or otherwise show Defendant's state of mind during the commission of the act that gives rise to the depraved mind charge.

**{27}** Because there are no external indicia of Defendant's subjective knowledge, we are left to scrutinize the circumstances of his alleged depraved mind conduct to ascertain whether there is substantial evidence to infer that Defendant knew his act was greatly dangerous to the lives of others. While circumstantial evidence alone can sustain a finding of subjective knowledge, we are still reluctant to find depraved mind murder when that evidence is limited to the depraved mind act alone. *Reed*, 2005-NMSC-031, ¶ 43. Our decision in *Reed* illustrates this principle: in that case, the defendant was indicted on a depraved mind murder charge after inexplicably pointing his revolver at a friend, squeezing the trigger, and killing the friend with a single shot. *Id*. ¶¶ 6-7. The defendant testified that he had loaded a single bullet into the revolver, believing it was positioned not to discharge. *Id*. ¶ 6. We concluded that the circumstances did not "lend themselves to one obvious conclusion" that the defendant was subjectively aware that he "was taking a grave risk with respect to everyone in the living room." *Id*. ¶ 32. Because the defendant harbored no animosity against the victim or any other occupant of the room, no direct testimony supported an intentional act, and the evidence was insubstantial, the State failed to establish the presence of a depraved mind. *Id*. ¶¶ 33-35.

**{28}** The circumstances in this case represent a marked contrast to those that triggered the concerns we expressed in *Reed*. Unlike *Reed*, Defendant's conduct does not appear to be an inexplicable and momentary act of homicidal misfortune. In *Reed*, the defendant fired a single gunshot in a moment's time, unhinged from any apparent explanation. *Id*. ¶ 6; *Brown*, 1996-NMSC-073, ¶ 7. As we explained in *Reed*, the circumstances did not give rise to the "obvious conclusion" that defendant was aware his actions were "a grave risk" to the lives of others. 2005-NMSC-031, ¶ 32.

**{29}** In this case, Defendant perpetrated a sustained course of conduct from which a reasonable jury could infer that he possessed the requisite subjective knowledge to demonstrate the presence of a depraved mind. The jury was exposed to a parade of witnesses who testified consistently–and largely uncontradicted–to the wanton and reckless

10

character of Defendant's conduct. Even though Defendant displayed little in the way of hostile emotion in the aftermath of his actions, the prolonged and reckless character of his driving spree stands in marked contrast to the instantaneous killing perpetrated by the defendant in *Reed*. Defendant had many opportunities to abandon his conduct, including following his collision with the jogger and after killing the pedestrian, yet he chose to continue until his truck was no longer functional. There was substantial evidence for the jury to infer that Defendant acted with subjective knowledge that his act was greatly dangerous to the lives of others.

{30} Of particular relevance was the testimony that Defendant deliberately struck the jogger. Two witnesses testified that Defendant intentionally collided with the jogger, leading the jury to convict Defendant of aggravated battery with a deadly weapon. In order to convict for aggravated battery, a jury must find an "application of force" with the specific "intent to injure." Section 30-3-5(A). For the jury to conclude that Defendant's conduct indicated an intent to injure the jogger by hitting her with the truck, it was necessary to conclude that Defendant was aware of the potentially injurious nature of such a collision. In other words, Defendant could not have committed aggravated battery–a conviction not contested in this appeal–without comprehending the danger inherent in his behavior. *See State v. Wynn*, 2001-NMCA-020, ¶ 4, 130 N.M. 381, 24 P.3d 816 (holding that to prove aggravated battery, the State must prove that the defendant "subjectively intended the consequences of application of force to the victim and injury to the victim from that application of force").

{31} Defendant contends that his mindset during the collision with the jogger has no bearing on his mens rea during the "separate and distinct" act of killing the pedestrian. Therefore, Defendant argues that the aggravated battery against the jogger "did nothing to establish" that Defendant possessed subjective knowledge of the dangerous character of his conduct when he struck the pedestrian approximately one minute later. Because his driving actions were part of an uninterrupted course of consistent conduct, it is not reasonable to conclude that Defendant did not realize that his conduct was dangerous after his collision with the jogger. It was reasonable for the jury to infer that Defendant knew his conduct was dangerous to the lives of others as he continued his reckless driving down the road after his initial collision with a jogger.

{32} The jury also heard substantial testimony regarding an alternate basis to infer Defendant's subjective knowledge on a fact he conceded: his repeated avoidance of other motorists along the road. As the State argues, a motorist who takes great pains to avoid collisions with other vehicles arguably displays an understanding of the consequences of a collision. Such conduct betrays comprehension that a collision involves danger–danger that imperils the operators of the vehicles and any nearby pedestrians, such as the pedestrian he struck. *See, e.g., People v. Murray*, 275 Cal. Rptr. 498, 506 (Cal. Ct. App. 1990) (jury could infer that defendant was actually "aware" of the dangerousness posed by his reckless driving where he actively avoided collisions with other motorists); *People v. McCarnes*, 224 Cal. Rptr. 846, 852 (Cal. Ct. App. 1986) (court held that defendant was aware of the danger for

others posed by his "reckless, high-speed passing maneuvers on two-lane roads, involving repeated and deliberate driving into oncoming traffic, and culminating in a head-on collision"); *McKinley v. State*, 945 A.2d 1158, 1164 (Del. 2008) (court observed that defendant's "attempt to reduce his speed [when crossing traffic intersections] demonstrates that he perceived the risk" of his extremely reckless driving).

{33}    The jury was presented with substantial testimony to establish Defendant's active avoidance of other motorists. One witness testified that when Defendant encountered a sport utility vehicle and a cement truck occupying both lanes of traffic so that he could not pass them in the traffic lanes, he veered onto the dirt median and sped past the vehicles there. Moments later, Defendant executed another risky maneuver to avoid a different motorist. This time, he was traveling the wrong way in the northbound lanes after he hit the pedestrian when he skidded onto the median, narrowly avoiding an oncoming motorist, and instead collided with a boulder on the median. These deliberate efforts to avoid collisions provided the jury with a straightforward and rational basis to infer Defendant's subjective knowledge of the dangerousness of his conduct.

{34}    Defendant argues that his conduct may give rise to alternative viable inferences that do not suggest subjective knowledge, such as the simple desire to flee the scene of the collision with the jogger. However, our role is not to choose between competing viable inferences. Rather, we investigate the record to ascertain whether the jury was in a position to make the inferences that support its verdict. *See Sutphin,* 107 N.M. at 131, 753 P.2d at 1319. Our scrutiny of the record reveals that a jury could rationally conclude, beyond a reasonable doubt, that Defendant "knew that his act was greatly dangerous to the lives of others." UJI 14-203.

### 2.    Sufficient Evidence Supports a Jury Finding that Defendant's Act Was Greatly Dangerous to the Life of More than One Person.

{35}    We next address Defendant's multiplicity argument, that his act was not "greatly dangerous" to more than one person. *Reed*, 2005-NMSC-031, ¶ 22 (internal quotation marks and citation omitted). Defendant concedes that his conduct endangered the pedestrian, but that the collision with the jogger was a separate act and was improperly cumulated to satisfy the multiplicity requirement of depraved mind murder. Defendant also contends that none of the motorists he encountered along the road were endangered, and therefore they cannot serve as a basis to conclude that his act was "greatly dangerous to the lives of others." Section 30-2-1(A)(3). We reject both arguments.

{36}    New Mexico law defines "depraved mind murder" as "any act *greatly dangerous to the lives of others*, indicating a depraved mind regardless of human life." *Id.* (emphasis added). Thus, we require that "more than one person" be endangered by the defendant's reckless conduct to establish depraved mind murder. *DeSantos*, 89 N.M. at 461, 553 P.2d at 1268. This requirement is consistent with the unintentional yet wanton nature of the depraved mind act, namely that depraved mind murder "has been limited to reckless acts in

12

disregard of human life in general as opposed to the deliberate intention to kill one particular person." *Id.* This expression of "universal malice" underscores our multiplicity requirement. *See id.*

{37} Based upon this Court's previous determinations of the term "act" in Section 30-2-1(A)(3), we find no basis to conclude that the collisions with the jogger and the pedestrian should be considered separate incidents or acts and not cumulated to satisfy the multiplicity standard. In *State v. Hernandez*, we considered the point at which a depraved mind act is completed, and thus, when a defendant ceases to imperil others through his or her depraved mind conduct. 117 N.M. 497, 499, 873 P.2d 243, 245 (1994). In *Hernandez*, the defendant fired several gun shots at acquaintances visiting his home who had "interfer[ed] in his personal affairs." *Id.* at 498, 873 P.2d at 244. The defendant initially fired the shots in his backyard, then proceeded to fire additional shots, pursuing the acquaintances as they fled. *Id.* None of the shots fired by the defendant during this episode struck any of his targets. *Id.* The defendant then stopped shooting and began to walk back to his house. At this point two of the men at whom the defendant had been shooting tackled the defendant and attempted to retrieve the gun. In the course of that struggle, one of the men was killed. At trial, the jury convicted the defendant of depraved mind murder. *Id.*

{38} We overturned the conviction in *Hernandez* because the depraved mind act had ceased when the victim was killed. While we conceded that the initial shooting spree could constitute a depraved mind act, once the defendant abandoned the "depraved" conduct and began to return home, he was no longer engaged in an act exhibiting a depraved mind. *Id.* at 499, 873 P.2d at 245. We held that the shooting spree and the struggle to disarm the defendant were "distinguishable and separate" acts. *Id.* The defendant's retreat indicated a change in his state of mind–an alteration of intent that evidenced an abandonment of the depraved mind conduct. *Id.*

{39} In the instant matter, Defendant's conduct showed neither a departure nor abandonment of the act giving rise to the depraved mind allegation. To the contrary, the record is clear that his conduct continued unabated from the time he struck the jogger until his truck stopped after colliding with the boulder on the median. Unlike the defendant in *Hernandez*, Defendant neither abandoned nor retreated from the course of conduct that gave rise to the extreme danger that resulted in the two pedestrian collisions. The record makes clear that Defendant's erratic driving for nearly a mile constituted a single, uninterrupted act. Therefore, a rational jury could have properly cumulated the two pedestrian collisions to establish beyond a reasonable doubt that Defendant's act was "greatly dangerous" to more than one person.

{40} Even if we were to accept Defendant's view that the two collisions constituted separate acts under Section 30-2-1(A)(3), there is sufficient evidence that Defendant's conduct was "greatly dangerous" to at least one motorist he encountered on Roadrunner Parkway. At trial, a witness testified that she was driving northbound on Roadrunner Parkway when Defendant's truck came directly toward her, traveling in the wrong direction

13

in the northbound lanes. Before the two vehicles could collide, Defendant veered onto the median and crashed into a boulder, bringing his truck to a stop. The witness testified that Defendant was within 30 feet of her car before he veered onto the median and she feared they would collide. It was rational for the jury to conclude that Defendant's conduct was greatly dangerous to this witness, thereby including her under the multiplicity requirement.

{41} Moreover, the circumstances of this case do not implicate the policy concerns that underscore the multiplicity requirement. As we have noted previously, the multiplicity requirement serves to preclude depraved mind convictions where the defendant's conduct is directed at one "particular person" and no others are endangered. *DeSantos*, 89 N.M. at 461, 553 P.2d at 1268. In such instances, application of depraved mind murder would serve as an inappropriate "fallback" remedy in lieu of proving intentional murder. *Reed*, 2005-NMSC-031, ¶ 25. The concerns in *Reed* are not implicated where the defendant's act, as here, is not directed at any one particular individual. For the foregoing reasons, we reject Defendant's claim that his conduct was not "greatly dangerous" to more than one person.

### 3. Sufficient Evidence Supports the Finding that Defendant's Conduct "Indicat[ed] a Depraved Mind Without Regard for Human Life."

{42} The record is replete with eyewitness accounts of Defendant's recklessness and apparent disregard for the lives of his fellow citizens that permitted the jury to find the presence of "a depraved mind without regard for human life." From the outset of the trial testimony, evidence was presented enabling the jury to infer that Defendant harbored no concern for the well-being of either pedestrians or his fellow motorists. While witnesses conveyed that Defendant's intentional collision with the jogger was a horrifying event, Defendant's conduct immediately subsequent to that collision–driving recklessly and almost immediately striking another pedestrian–gives rise to the depraved mind charge that warranted the jury's conclusion that his conduct met the high standard for a depraved mind. In fact, witness testimony indicated that Defendant's recklessness seemed to crescendo in the moments after the initial collision with the jogger. Defendant made no effort to stop and tend to the jogger, and instead fled the scene. During his flight, Defendant's speed "probably" approached 80 miles per hour, prompting Defendant to recklessly maneuver around other motorists in his path as he negotiated the midday traffic. His driving spree only ended when his truck would no longer function after cresting a blind rise, striking the fatally injured pedestrian, re-entering the northbound lanes going the wrong way, veering onto the median to avoid an oncoming car, and colliding with a large landscaping boulder. A police officer testified that physical evidence at the scene was consistent with the conclusion that Defendant did not brake before he hit his second victim. After his truck crashed, Defendant ran from the scene, again neglecting to check on his second victim.

{43} Of particular poignance is Defendant's reaction to the collisions with his two victims. After striking the jogger, an act adjudged intentional and knowing by the jury, Defendant not only failed to stop, but rather the reckless character of his conduct appeared to increase. Witnesses testified that he drove at speeds more than double the posted limit, recklessly

14

avoided all obstacles in his path, and only stopped when his truck was no longer mobile. After hitting the pedestrian with adequate force to jar her brain from her skull, Defendant demonstrated no apparent concern for her well-being. Instead, he ran from the scene into a suburban neighborhood where he asked a resident for a ride to Wal-Mart.

**{44}** Our view that the "[dis]regard for human life" required to establish a depraved mind can be inferred from such reckless driving finds support in jurisdictions outside New Mexico. *See, e.g., People v. Gomez*, 478 N.E.2d 759, 761 (N.Y. 1985) (court found "indifference to human life" where the defendant drove at high rates of speed on busy Manhattan city streets, collided with other motorists, wove from lane to lane, and then drove onto the sidewalk, striking and killing two children riding bicycles); *People v. Moore*, 114 Cal. Rptr. 3d 540, 543 (Cal. Ct. App. 2010) (defendant "acted with wanton disregard of the near certainty that someone would be killed" where defendant "drove 70 miles per hour in a 35-mile-per-hour zone, crossed into the opposing traffic lane, caused oncoming drivers to avoid him, ran a red light and struck a car in the intersection without even attempting to apply his brakes"); *State v. Mouzon*, 99 S.E.2d 672, 675 (S.C. 1957) (where a highly intoxicated driver drove 70-80 miles per hour in a 35-mile-per-hour zone, killing a pedestrian, and made no effort to avoid the accident, the court concluded "there is evidence of such recklessness and wantonness as to indicate a depravity of mind and disregard of human life"); *McKinley*, 945 A.2d at 1159-60 (court concluded there was sufficient evidence that defendant's conduct constituted "'cruel, wicked and depraved indifference to human life'" where he drove at speeds between 88 and 98 miles per hour, fled police pursuit, failed to stop at multiple stop signs and red lights, drove down the wrong side of the road and onto the shoulder to pass other motorists, and ultimately collided with and killed another motorist). Of course, it is important to bear in mind that all of these jurisdictions classify depraved mind murder in the second degree.

**{45}** Defendant also argues that the intentional driving spree by itself is inadequate to establish Defendant's depraved mind. This argument misconstrues the law of depraved mind murder in New Mexico. While we have emphasized the value of some external indicia of a defendant's depravity, such as personal animus, the absence of such factors does not preclude the finding of a depraved mind. As we explained in *Reed*, it is only when "the circumstances alone do not manifest a depraved indifference to human life" that "there must be some circumstances showing malevolence or indifference other than the doing of [the depraved mind] act." 2005-NMSC-031, ¶ 43. As we have discussed, the jury in this case had access to substantial evidence from the circumstances of the depraved mind act alone to support the inference that Defendant harbored "a depraved mind without regard for human life." UJI 14-203.

**{46}** Finally, Defendant argues that his actions fall well short of the circumstances of *Omar-Muhammad*, the only other case where we determined that sufficient evidence existed for a jury to conclude that a motorist possessed a "depraved mind." 102 N.M. at 274, 694 P.2d at 922. However, because the circumstances of *Omar-Muhammad* were markedly different from this matter, nothing in that case precludes our conclusions here. *Omar-*

15

*Muhammad* involved a clear-cut factual scenario where the defendant conceded that he acted intentionally in his attempts to collide with police officers during a high-speed police pursuit. *Id.* at 276, 694 P.2d at 924. His expressions of personal animosity and admission of subjective knowledge provided direct proof that did not require the more intensive review mandated by the circumstances in this case.

## IV.    CONCLUSION

{47}    For the foregoing reasons, Defendant's sufficiency of the evidence claim fails and there is no bar to retrying him on the depraved mind murder charge. Therefore, we remand for a new trial consistent with this Opinion, including the use of the revised UJI 14-203.

{48}    **IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

**Topic Index for *State v. Dowling*, Docket No. 31,105**

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DJ | Double Jeopardy |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CF | Capital Felony |
| CL-HO | Homicide |
| CL-MU | Murder |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-DJ | Double Jeopardy |
| CA-JI | Jury Instructions |

**EV**          **EVIDENCE**
EV-SS           Sufficient Evidence

**JI**          **JURY INSTRUCTIONS**
JI-CJ           Criminal Jury Instruction
JI-FG           Failure to Give or Request
JI-IJ           Improper Jury Instruction
JI-JI           Jury Instructions, General