This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date:** _____

**NO. 33,200**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**FERNANDO LOPEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
Thomas A. Rutledge, District Judge

Bennett J. Baur, Acting Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Olga Serafimova, Assistant Attorney General
Santa Fe, NM

for Appellee

**BOSSON, Justice.**

{1} On June 24, 2011, a jury convicted Defendant Fernando Lopez of first-degree murder for the fatal shooting of Rudolfo Murillo. Sentenced to life imprisonment, Defendant appeals his conviction directly to this Court pursuant to Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA.

{2} We decide this case by unpublished decision pursuant to Rule 12-405(B)(1) NMRA because New Mexico case law sufficiently addresses the issues raised in this appeal. For the following reasons, we affirm Defendant's first-degree murder conviction; however, because Defendant's conviction was improperly enhanced by one year for the use of a firearm, we remand for an amended judgment and sentence.

**BACKGROUND**

{3} On July 4, 2009, Defendant, a former police officer from Mexico, shot and killed Rudolfo Murillo. Defendant and his wife, Ashley Lopez, were attending a wedding the evening the shooting occurred. Ashley's family, including her cousin Murillo, were also at the wedding. At some point during the evening, Defendant and Murillo left the wedding to obtain more beer. It was during the excursion to obtain beer when the shooting occurred. The details of what transpired next are taken from the evidence or reasonable inferences from the evidence that the jury was entitled to

draw.

{4} During a police interrogation, Defendant recounted two different versions of events as to what happened prior to the shooting. At trial, however, Defendant testified that only one of the stories he told during the police interview was true. Defendant testified that he and Murillo were returning to the party when Murillo put a knife to his throat and asked for money to buy drugs. At this point, Defendant pulled the car over to the side of the road, as he could not drive while Murillo had the knife to his throat.

{5} Defendant told Murillo he only had $25, but he would be willing to use his bank card to obtain money from an ATM. In response, Murillo said that he would make Defendant's wife have sexual relations with a drug dealer to obtain drugs if Defendant did not give him more money. This made Defendant both angry and scared.

{6} While parked on the side of the road, Defendant remembered having a gun in the center console of his car. After removing the gun from the center console and from its holster, he told Murillo not to get involved with his family and walked to the passenger side of the car. Defendant told Murillo to get out of the car. Murillo refused, so Defendant pulled him out of the car by his shirt. When Defendant pulled Murillo out of the car, Murillo called Defendant a "motherf ----- " and lunged at him with a knife. Murillo had the knife in his right hand and came at Defendant.

2

Defendant then backed up when Murillo came towards him, yet Murillo continued to attack him. Defendant stated he was afraid Murillo was going to kill him, so he shot him.

{7} Defendant shot Murillo twice—the first shot was to Murillo's chest and the second shot was in Murillo's head. According to testimony of the medical investigator, either shot was fatal. After shooting Murillo, Defendant picked up the knife, placed it in the glove compartment and drove back to the party, leaving Murillo's body by the side of the road. Soon thereafter, Defendant and his wife left the party. On the drive home, Defendant told his wife that he may have shot Murillo, but he did not indicate that he had shot and killed him.

{8} Defendant's wife then called her father, Fernando Carrillo, and told him about the shooting. Carrillo took Defendant's gun and the clothes he was wearing during the shooting and threw them away. Defendant fled to Mexico the next day. Defendant turned himself in to United States authorities fifteen days later.

{9} A jury convicted Defendant of first-degree murder on June 24, 2011. The judge sentenced Defendant to life in prison, enhanced by one year for use of a firearm. This appeal followed.

**DISCUSSION**

{10} Defendant raises four issues on appeal. First, Defendant argues that his first-degree murder conviction was not supported by sufficient evidence, specifically the

aggravated mental state required of that crime. Second, Defendant argues that the district court erred in refusing to order the State to generate and disclose National Criminal Information Center (NCIC) reports on its witnesses as well as the victim who allegedly had a violent criminal past. Third, Defendant argues that one of the law enforcement witnesses at trial improperly opined that Defendant had committed the crime. Fourth, Defendant argues that the district court erred by enhancing his life sentence by one year for use of a firearm, contrary to the language of NMSA 1978, Section 31-18-16(A) (1993) (providing that a sentence for a noncapital felony shall be increased by one year if the jury or court determines that a firearm was used during the commission of the crime). We will address each of Defendant's arguments in turn.

**Sufficient Evidence Supports Defendant's First Degree Murder Conviction**

{11} Although he does not deny killing Murillo, Defendant claims there was insufficient evidence to prove he killed Murillo with premeditation and deliberation. In New Mexico, first-degree murder includes "the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing." NMSA 1978, § 30-2-1(A)(1) (1994). "The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201 NMRA. "Although deliberate intent requires a 'calculated judgment' to kill, the

4

weighing required for deliberate intent 'may be arrived at in a short period of time.'" *State v. Largo*, 2012-NMSC-015, ¶ 31, 278 P.3d 532 (quoting UJI 14-201). The jury in this case was given the first-degree murder instruction with the definition of deliberate intent, as well as the step-down instructions for second-degree murder and voluntary manslaughter.

{12} When evaluating the evidence to support a conviction, we determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sena*, 2008-NMSC-053, ¶ 10, 144 N.M. 821, 192 P.3d 1198 (internal quotation marks and citation omitted). We view the evidence "in the light most favorable to the State, resolving all conflicts and making all permissible inferences in favor of the jury's verdict." *State v. Dowling*, 2011-NMSC-016, ¶ 20, 150 N.M. 110, 257 P.3d 930. "It is our duty to determine whether any rational jury could have found the essential facts to establish each element of the crime beyond a reasonable doubt." *Id.*

{13} Sufficient evidence supported Defendant's first-degree murder conviction. The jury reasonably could have concluded that the following sequence of events occurred. Defendant pulled his car to the side of the road. He opened the center console to retrieve his gun. Once he had the gun in hand, he removed it from the holster and got out of the car, walked around the car to the passenger side, and forced Murillo out of

5

the car. Defendant then shot Murillo on the side of the road, two times, both shots fatally wounding Murillo.

{14} We have previously stated that "[w]hile the retrieval of a weapon before killing a victim could potentially give a killer an opportunity to deliberate, the burden remains on the State to produce evidence that tends to show that the killer actually did so." *State v. Adonis*, 2008-NMSC-059, ¶ 22, 145 N.M. 102, 194 P.3d 717 (internal quotation marks and citation omitted). Here, Defendant's calculated actions as described above, considered in total, could reasonably lead a jury to conclude that Defendant had both the opportunity to deliberate, and did in fact deliberate before shooting Murillo.

{15} Defendant claims that while on the side of the road Murillo lunged at him with a knife, and that he shot Murillo in an act of self-defense, or at very worst out of provocation. The State presented evidence questioning this self-defense theory, suggesting that Murillo was not holding a knife when Defendant pulled him out of the car. Evidence demonstrated that neither Defendant nor Murillo had defensive wounds, suggesting that no fight occurred prior to the shooting.

{16} Further, the jury saw a picture of the crime scene showing Murillo lying on the ground with a knife in the pocket of his pants and a paper towel clutched in his left hand. There was also evidence that a beer can—the same type that Murillo and Defendant had purchased—lay near Murillo's body. Defendant could not explain why

6

Murillo had a paper towel in his hand or where the beer can came from. According to the State's theory, Murillo could not have been holding a knife when Defendant removed him from the car, because Murillo's hands were full with a beer can in his right hand and a paper towel in his left.

{17} Significantly, during his in-station interview Defendant stated that the knife had fallen out of Murillo's hands when Defendant removed him from the car. Lieutenant Burns, the officer who conducted Defendant's in-station interview, confirmed this during his testimony. Lieutenant Burns testified that at the conclusion of Defendant's interview, Defendant admitted that Murillo was *not* holding a knife when Defendant removed him from the car. Additionally, when law enforcement searched Defendant's car the next day, the officer who conducted the search did not find any knives in the glove compartment or elsewhere in the car. After this search, the car was turned over to the family. It was not until a later search, after the car had been in the custody of Defendant's family, that Defendant's wife directed deputies to look in the glove compartment. Only then did they discover two knives.

{18} Based on the evidence, the jury reasonably could have concluded that Murillo was not holding a knife when Defendant pulled him out of the car. This, in turn, suggests that Defendant was *not* acting in self-defense or under sufficient provocation when he shot Murillo, and he may have killed with premeditation and deliberation. This evidence also undermines Defendant's credibility when he testified that he did

not kill Murillo in a deliberate or premeditated way. Defendant even conceded that, "I don't have sufficient evidence to prove it was self-defense, or how things happened." *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (recognizing that a "jury is free to reject Defendant's version of the facts").

{19} It is undisputed that Defendant shot Murillo not once but twice, which further supports a conclusion that Defendant acted deliberately. Lieutenant Burns testified that the first shot was likely the shot to the heart, and the second shot was to the head. The Lieutenant opined that the shot to the head likely occurred with Defendant standing over Murillo, who was already lying on the ground as a result of the first shot. The Lieutenant based his conclusions on the placement of the bullet casings and the bullet wounds. The Lieutenant also testified about the lack of defensive wounds on either Murillo or Defendant, indicating that this was not a fight or an altercation, but rather this appeared to be "just a shooting." We have previously discussed how evidence of an execution-style killing can reasonably demonstrate premeditation and deliberation to a jury. *See State v. Cunningham*, 2000-NMSC-009, ¶ 28, 128 N.M. 711, 998 P.2d 176 (describing how a defendant fired the fatal shot to a victim who was already "incapacitated and defenseless "); *see also State v. Sosa*, 2000-NMSC-036, ¶ 13, 129 N.M. 767, 14 P.3d 32 (finding sufficient evidence of premeditation and deliberation when defendant continued to fire at unarmed and defenseless victim fleeing from defendant).

8

{20} Defendant's actions after Murillo's shooting reasonably support a similar conclusion. Evidence of flight can demonstrate "consciousness of guilt." *State v. Martinez*, 1999-NMSC-018, ¶¶ 29-30, 127 N.M. 207, 979 P.2d 718 (recognizing evidence of flight is admissible and relevant as it "may constitute evidence of consciousness of guilt"). After shooting Murillo and leaving him dead on the side of the road, Defendant returned to the party where, in a particularly cold-blooded fashion, he told partygoers that Murillo had stayed at the store with some friends. Defendant did not appear upset at the party, eventually leaving with his wife and children. Finally, Defendant fled to Mexico the day following the shooting.

{21} Defendant also lied during his in-station interview. Defendant initially told the police that two other men, including Murillo, had threatened him with a knife in his car. Defendant claimed that once he pulled his car over, he shot his gun into the air to scare the men, but because Murillo continued to attack him, he shot Murillo. This story was a complete fabrication. *See State v. Flores*, 2010-NMSC-002, ¶¶ 22-23, 147 N.M. 542, 226 P.3d 641 (finding sufficient evidence to support a first-degree willful and deliberate murder conviction when a defendant did many things, including immediately and calmly walking away from the dead body, and attempting to deceive and evade authorities). Therefore, there was sufficient evidence supporting Defendant's first-degree murder conviction.

**The District Court Did Not Err in Refusing to Order the State to Generate and Disclose NCIC Reports of the Victim and the State's Witnesses**

**{22}** Defendant argues that the district court erred by refusing to issue a court order directing the State to generate and disclose alleged NCIC reports of the victim and its witnesses. **[BIC 28, AB 8]** Defendant contends that the State's failure to disclose this material violated Rule 5-501 NMRA (regarding information that is subject to disclosure by the State) and *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

**{23}** We review a district court's decisions concerning discovery for an abuse of discretion. *State v. Dominguez*, 2007-NMSC-060, ¶ 25, 142 N.M. 811, 171 P.3d 750. In order to establish a *Brady* violation, the defendant "must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." *Case v. Hatch*, 2008-NMSC-024, ¶ 44, 144 N.M. 20, 183 P.3d 905 (internal quotation marks and citation omitted).

**{24}** Defendant cannot demonstrate any of the elements necessary to establish a *Brady* violation. The prosecution had no such evidence within its custody or even knowledge. *See* Rule 5-501(A)(5) ("[T]he state shall disclose or make available to the defendant . . . any record of prior convictions of any such witness which is within the *knowledge* of the prosecutor.") (emphasis added); *see also* Rule 5-501(A)(3) (directing the state to disclose various items "which are within the possession, custody

10

or control of the state . . . ."). At the pretrial hearing, the State informed the court that it did not have the NCIC reports Defendant requested. The judge took judicial notice that prosecutors can only use the NCIC system to obtain records relevant to the accused, and allegedly no one else. The State claimed that prosecutors were "subject . . . to civil liability" if they obtained NCIC reports on anyone other than the accused.[1] We are not asked to confirm or deny that assertion. Further, the State asserted that it uses www.nmcourts.gov to obtain information regarding prior criminal convictions of witnesses other than the accused.

**{25}** Based on this information, the district court denied Defendant's motion, reasoning that everyone has access to www.nmcourts.gov and that Defendant could conduct a search on that website to obtain information regarding the victim and witnesses. Significant to this appeal, at the conclusion of the hearing the court stated to defense counsel that "if you are unsuccessful in obtaining information, then you can bring this matter back before the court." Defense counsel never returned to the court to request its assistance or otherwise pursue the matter.

**{26}** In *State v. Boergadine*, 2005-NMCA-028, ¶¶ 34, 36, 137 N.M. 92, 107 P.3d 532, our Court of Appeals denied a defendant's ineffective-assistance-of-counsel

---

[1]We recognize that defense counsel claimed that courts around the state treat the disclosure of NCIC reports differently. There is not enough information in this record for us to decide whether prosecutors routinely obtain NCIC reports on defendants and witnesses or whether the State could have done so in this case.

11

claim where defense counsel failed to obtain an NCIC report on a witness. In that case, the accused sought an NCIC report of a state witness, "just for credibility purposes." *Id.* ¶ 7 (internal quotation marks omitted). The district court ordered the State to disclose the report if it already had one in its possession, but relieved the State of any obligation to obtain additional reports. *Id.* In holding that counsel was not ineffective for "acquiescing to the [district] court's refusal to order disclosure of the N.C.I.C. report," the Court of Appeals stated that "[a] mere desire to have a report is insufficient to show materiality." *Id.* ¶ 36. The same is true here. Defendant's mere desire to have the NCIC reports pertaining to the victim and certain witnesses is insufficient to show why the reports were material to his defense, that the information revealed from those reports would have changed the result of the trial, or even would have been useful to the defense.

**The District Court Did Not Err in Admitting Testimony of Lieutenant Burns**

{27}    Defendant argues that the district court impermissibly allowed Lieutenant Burns to give an opinion that Defendant committed the crime. Lieutenant Burns conducted portions of a three-hour video interview with Defendant; the video was played for the jury in full. During this interview, Defendant recounted two different versions of the events that night.

{28}    In the interview, on at least twelve occasions Lieutenant Burns told Defendant that he believed Defendant was lying. Lieutenant Burns pressed Defendant for

12

information about the knives allegedly involved in the incident. The Lieutenant told Defendant that he thought Defendant was lying about whether Murillo was holding a knife when Defendant removed him from the car. Defendant stated that Murillo had a knife while they were in the car, but he could not recall whether Murillo had a knife when he removed him from the car. The Lieutenant countered this statement, saying "we know he didn't have a knife." According to Lieutenant Burns, at the end of the interview, Defendant agreed with him, conceding that Murillo did not have a knife.

{29} During Lieutenant Burns' testimony at trial, the State asked him about the two different stories Defendant told during the interview. Specifically, the State asked Lieutenant Burns about why he continued to press Defendant about his story that Murillo had a knife. Lieutenant Burns testified that he brought the knives up because he knew Murillo had a paper towel in one hand and may have had a beer can in the other, and he wanted to rule out the story that Murillo had a knife. The State followed up, confirming with Lieutenant Burns that Defendant had changed his story at the conclusion of the interview. The State then asked him, "did the story at the end [of the interview] fit the evidence at the scene?" Lieutenant Burns responded, "I thought it did; I thought it was very plausible."

{30} Defense counsel objected immediately. Counsel asserted that this testimony invaded the province of the jury because it called for Lieutenant Burns to offer his opinion as to whether Defendant committed the crime and therefore did not act in self-

13

defense. The State responded that it had only asked Lieutenant Burns whether Defendant's second story matched the evidence at the scene. Defense counsel then moved for a mistrial, arguing that Lieutenant Burns was commenting on Defendant's veracity.

{31} The district court denied the motion for mistrial. The court reasoned that the jury had already watched the three-hour interview which showed Defendant changing his story, and had already heard Lieutenant Burns tell Defendant that he thought he was lying. Without Defense counsel's request, the court offered to provide the jury with a general curative instruction, informing the jury that they should give each of the witnesses' testimony such weight as it merits, or that they could simply ignore the testimony. The court did give a general curative instruction at the end of trial.

{32} The court did not abuse its discretion in denying the motion for mistrial based on Lieutenant Burns' testimony. *State v. Gallegos*, 2009-NMSC-017, ¶ 21, 146 N.M. 88, 206 P.3d 993 (stating that we review a trial court's denial of a motion for mistrial for an abuse of discretion). A jury's role is to determine guilt or innocence. *State v. Brown*, 1997-NMSC-029, ¶ 14, 123 N.M. 413, 941 P.2d 494. Because determining guilt or innocence is within the province of the jury, "it is improper for a law enforcement officer to give his opinion as to the *ultimate issue* in the case." *State v. Ashley*, 1997-NMSC-049, ¶ 19, 124 N.M. 1, 946 P.2d 205 (emphasis added).

{33} Lieutenant Burns did not testify as to the ultimate issue in the

case—Defendant's guilt or innocence. Rather, Lieutenant Burns testified that he found "it very plausible" that Defendant's second story regarding the lack of a knife and the series of events leading up to the shooting comported with the evidence at the scene. The court was within its discretion to allow Lieutenant Burns to testify as to which story was consistent with the evidence.

**The District Court Improperly Enhanced Defendant's Sentence By One Year**

{34}  Both Defendant and the State agree that the district court improperly enhanced Defendant's first-degree murder sentence for the use of a firearm during the commission of the crime. The jury convicted Defendant of first-degree murder and also made a finding that Defendant used a firearm "in the commission of Murder in the First Degree." The court sentenced Defendant to life imprisonment, "plus one additional year for the firearms enhancement as determined by the jury in the special finding required by law."

{35}  Although Defendant did not preserve this issue below, "[a] trial court does not have jurisdiction to impose an illegal sentence on a defendant and, therefore, any party may challenge an illegal sentence for the first time on appeal." *State v. Paiz*, 2011-NMSC-008, ¶ 33, 149 N.M. 412, 249 P.3d 1235. Section 31-18-16(A) provides that when the jury makes a separate finding of fact "that a firearm was used in the commission of a *noncapital felony* the basic sentence of imprisonment prescribed for the offense in Section 31-18-15 NMSA 1978 shall be increased by one year . . . ."

(emphasis added).

{36}     First-degree murder is a capital felony.  NMSA 1978, § 30-2-1(A) ("Whoever commits murder in the first degree is guilty of a *capital* felony.") (emphasis added). The firearm enhancement does not apply to capital felonies, only noncapital felonies. *State v. King*, 90 N.M. 377, 379, 563 P.2d 1170, 1172 (Ct. App. 1977) ("[F]irst degree murder is defined as a capital felony and the firearm enhancement provision does not apply to capital felonies"), *overruled on other grounds by State v. Reynolds*, 98 N.M. 527, 529, 650 P.2d 811, 813 (1982).  We therefore agree with both Defendant and the State that the one-year enhancement to Defendant's life-sentence should be reversed.

**CONCLUSION**

{37}     For the reasons stated herein, we affirm Defendant's first-degree murder conviction, but also remand for the district court to enter an amended judgment and sentence removing the one-year firearm enhancement from Defendant's sentence.

{38}     **IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

16

_____

**PETRA JIMENEZ MAES, Chief Justice**


_____

**EDWARD L. CHÁVEZ, Justice**


_____

**CHARLES W. DANIELS, Justice**


_____

**BARBARA J. VIGIL**

17