# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date: December 13, 2018**

**NO. S-1-SC-35887**

**STATE OF NEW MEXICO**

      Plaintiff-Appellee,

v.

**DAVID CANDELARIA,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Jacqueline Flores, District Judge**

John A. McCall
Law Works, LLC
Albuquerque, NM

for Appellant


Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**VIGIL, Justice.**

{1}     This case stems from the tragic death of an innocent eight-year-old child as a result of a violent confrontation between two groups of men. Consequently, a jury convicted David Candelaria (Defendant) of first-degree depraved mind murder, two counts of shooting at or from a motor vehicle, and three counts of aggravated assault. One count of shooting at or from a motor vehicle was later vacated on double jeopardy grounds. The district court sentenced Defendant to life in prison plus nine years. Defendant now appeals his convictions for depraved mind murder and aggravated assault and asks this Court to vacate the convictions or order a new trial. For the reasons set forth below, we affirm Defendant's convictions and deny the relief requested.

**I.     BACKGROUND**

{2}     On the morning of May 31, 2013, Defendant and his son, David Candelaria, Jr. (David Jr.), went to the home of Richard Turrieta, Sr. (Richard Sr.) on the west side of Albuquerque. Defendant and Richard Sr. had been close friends since high school. Sometime later that afternoon, the group—Defendant, David Jr., Richard Sr., and Richard Turrieta, Jr. (Richard Jr.)—left Richard Sr.'s house and drove to Nine Mile Hill, west of Albuquerque, to take Defendant's truck "four-wheeling." Defendant's

truck got stuck in the sand and could not be freed, so the group started walking back to town. A nearby resident gave them a ride to Coors Boulevard and Bridge Boulevard, where the group began walking east of Coors toward the Alamosa Community Center (community center). Richard Sr. testified that as the group was walking north to Gonzales Road, a vehicle, later determined to be driven by Rudy Chavez Montoya (Rudy), which was also traveling north towards Gonzales Road, pulled close to the curb and stopped a few feet away from Defendant's group. According to Richard Sr., Richard Sr. asked Rudy for a ride and Rudy cursed at him, made a quick u-turn, and tried to run the group down as the group was walking on Airport Drive, the road that goes into the community center. Rudy, on the other hand, testified that he was headed toward the community center on Airport Drive to pick up some friends when he encountered the group "blocking the road." He explained that the group was walking in the middle of the road, away from the community center. He said the group approached him and asked him for a ride, and Rudy responded that he could not give the group a ride because he was picking up friends and his vehicle was full. Rudy testified that Defendant's group was "mad" when Rudy refused to pick them up. David Jr. testified that Rudy spoke to the group saying, "You guys look familiar," to which Richard Jr. replied, "Don't act hard." Witness testimony

2

differed as to the actual words exchanged by the parties and whether Rudy attempted to run over Defendant's group during this first encounter. According to Richard Sr., approximately twenty minutes passed before his group encountered Rudy again.

{3}     Rudy proceeded to the community center where he picked up his friend, Troy Fontanelle (Troy), Troy's younger brother Logan Fontanelle (Logan), and Troy's eight-year-old daughter, Sunni Reza (Sunni). Rudy sat in the driver's seat, Logan in the front passenger seat, Troy in the back seat behind Logan, and Sunni in the back middle seat beside Troy. Logan testified that Rudy told them about the incident with Defendant's group after Rudy picked up Logan and the others. Rudy and his passengers then headed north on Airport Drive toward Gonzales Road to pick up Rudy's daughter at his sister's house at 60th Street and Gonzales Road. Rudy testified that when he turned right onto Gonzales Road, Defendant's group jumped into the road, causing Rudy to stop his vehicle. Logan testified that Defendant's group was about a half a block away, but was walking toward them. Richard Sr. testified that the driver stopped on Gonzales Road; and according to Richard Jr., the vehicle was about eighty to one hundred yards away from Defendant's group. Logan testified that he was seated in the front passenger seat of Rudy's vehicle and could hear Defendant's group yelling at them. He testified that he got out of Rudy's vehicle and said, "Why

are you guys trying to jump my friend?" Rudy told the police that Logan had also asked Defendant's group if the group wanted to fight. Rudy testified that after Logan got out of the vehicle someone in Defendant's group started shooting. Logan testified that he heard gunshots and then saw one bullet hit the ground in front of him when he was standing outside Rudy's vehicle. He said he then jumped in the vehicle and at that point the next shot came through the windshield. This was the shot that hit Sunni. Rudy testified that he tried to run over Defendant's group with his vehicle after the group started shooting, but the group ran into an alley. He said that during the shooting he turned the vehicle around to avoid the bullets, headed towards Coors Boulevard, and realized that Sunni had been shot. Rudy drove Sunni to a nearby fire station for assistance and the fire department then took Sunni to the hospital. Sunni died of a gunshot wound to the forehead.

{4}     David Jr. testified that a person got out of Rudy's vehicle on the passenger side and he thought someone in the vehicle "possibly" had "a handgun or a rifle," but they were a "hundred yards out" and he "couldn't get a clear description of what it was." When police asked David Jr. who fired the shots, however, he said, "I'm pretty sure it was our party." In a statement to police, Defendant said that a person jumped out from what appeared to be the front passenger side of Rudy's vehicle with a machine

4

gun. Defendant also told police that the person was pointing a rifle straight at him. Richard Sr. testified that it seemed like the driver, as well as a passenger, exited Rudy's vehicle but stayed behind the doors, and when they got out of the vehicle he and Richard Jr. fled the scene. Richard Sr. indicated that he was too far from the vehicle to be able to see if anyone in Rudy's vehicle had a weapon. Rudy and Logan testified that no one in Rudy's vehicle had a weapon or a firearm.

{5}     David Jr. testified that Defendant had a handgun on him that day that had been retrieved from Defendant's truck at Nine Mile Hill when Defendant's group left the truck to walk back into town. It is unclear from the testimony who retrieved the gun from Defendant's truck. David Jr. testified that during this second encounter with Rudy's vehicle, Defendant fired the gun twice in the air and twice at the vehicle. In his statement to police, Defendant admitted firing the gun twice in the air and twice at the vehicle. David Jr. testified that he and Defendant then ran. David Jr. further testified that when Defendant dropped the gun, David Jr. picked it up and tried to hide it under a building. Officers testified to finding the gun under a portable school building. David Jr. later pled guilty to possession of a gun on school grounds and tampering with evidence.

{6}     The State introduced two witness statements given to police that indicated that

one of the occupants in Rudy's vehicle may have had a pistol and that one of the occupants was possibly shooting from the vehicle. An officer testified that police used those statements to obtain search warrants for locations where Rudy was believed to have gone after the incident. Officers found a rifle in Rudy's parents' home, but Rudy's parents testified that it did not work and Rudy's mother said their children did not even know about it.

{7} Detectives found five shell casings in the road that matched the cartridges in Defendant's gun that was hidden under the school building. No other shell casings were found at the scene and no firearms or rifles were found in Rudy's vehicle.

## II. DISCUSSION

## A. Depraved Mind Murder in New Mexico

{8} We begin our examination of Defendant's convictions with an explanation of depraved mind murder in New Mexico. In New Mexico, depraved mind murder is classified as a first-degree offense. *See* NMSA 1978, § 30-2-1(A)(3) (1994). As such, depraved mind murder is a capital felony, which carries a maximum penalty of life in prison. *See* NMSA 1978, § 31-20A-2 (2009). Depraved mind murder is defined as "the killing of one human being by another without lawful justification or excuse . . . by any act greatly dangerous to the lives of others, indicating a depraved mind

6

regardless of human life." Section 30-2-1(A)(3).

{9}    Our courts, receiving little guidance from our Legislature, have struggled to distinguish first-degree depraved mind murder from second-degree murder. Although the parties do not address the fine distinction between depraved mind murder and second-degree murder in their briefing, we take this opportunity to define the distinction between the two types of murder in an effort to assist parties and lower courts in the future. Second-degree murder, which carries a basic penalty of fifteen years in prison, is defined as follows:

> Unless [the person] is acting upon sufficient provocation, upon a sudden quarrel or in the heat of passion, a person who kills another human being without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death [the person] knows that such acts create a strong probability of death or great bodily harm to that individual or another.

Section 30-2-1(B). *See* NMSA 1978, § 31-18-15(A)(4) (2016). The knowledge requirement of depraved mind murder—knowledge that an act is "greatly dangerous to the lives of others, indicating a depraved mind regardless of human life," as distinguished from the knowledge requirement of second-degree murder—knowledge that an act "create[s] a strong probability of death or great bodily harm to [an] individual or another [person]," "has vexed New Mexico courts since 1980, when

New Mexico's current statutory definitions of the mens reas for murder in the first- and second-degree were enacted." Section 30-2-1(A)(3); Section 30-2-1(B); *State v. Suazo*, 2017-NMSC-011, ¶ 18, 390 P.3d 674; *see* UJI 14-203 NMRA; UJI 14-210 NMRA. Recently, in *Suazo*, this Court clarified that first-degree depraved mind murder and second-degree murder share the same subjective knowledge requirement—that a defendant *know* "the probable consequences" of the defendant's act, as opposed to *should have known* of the probable consequences. 2017-NMSC-011, ¶ 16. These requirements being equal, we turn to the defining characteristic of depraved mind murder—that the defendant acted with a depraved mind—to better understand the difference between the two crimes. *See State v. Reed*, 2005-NMSC-031, ¶ 21, 138 N.M. 365, 120 P.3d 447.

{10}  Prior to 2009, our depraved mind murder jury instruction provided the following:

> The defendant is charged with first degree murder by an act greatly dangerous to the lives of others indicating a depraved mind without regard for human life. For you to find the defendant guilty [as charged in Count _____][ ], the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. The defendant _____ *(describe act of defendant)*;

8

2. The defendant's act caused[ ] the death of _____ *(name of victim)*;

3. The act of the defendant was greatly dangerous to the lives of others, indicating a depraved mind without regard for human life;

4. The defendant knew that his act was greatly dangerous to the lives of others;

5. This happened in New Mexico on or about the _____ day of _____, _____.

UJI 14-203 NMRA (2008). To assist jurors in understanding what constitutes a depraved mind, our jury instruction was amended in 2009 to add the following explanation:

A person acts with a depraved mind by intentionally engaging in outrageously reckless conduct with a depraved kind of wantonness or total indifference for the value of human life. Mere negligence or recklessness is not enough. In addition, the defendant must have a corrupt, perverted, or malicious state of mind, such as when a person acts with ill will, hatred, spite, or evil intent. Whether a person acted with a depraved mind may be inferred from all the facts and circumstances of the case.

UJI 14-203 NMRA (2009). No further modifications of the language of the instruction have been made. As may be gleaned from the amended instruction, this Court has established four primary indicators of a depraved mind that aid in distinguishing first-degree depraved mind murder from second-degree murder. The

9

four indicators of a depraved mind are as follows: (1) "more than one person [was] endangered by the defendant's act," (2) the defendant's act was "intentional" and "extremely reckless," (3) the defendant had "subjective knowledge that his act was greatly dangerous to the lives of others," and (4) the defendant's act "encompass[ed] an intensified malice or evil intent." *State v. Dowling*, 2011-NMSC-016, ¶ 11, 150 N.M. 110, 257 P.3d 930 (internal quotation marks and citations omitted). We explain each of these indicators, below.

{11} First, depraved mind murder is "limited to acts that are dangerous to more than one person," such as "shooting into a crowd" or "placing a bomb in a public place." *Reed*, 2005-NMSC-031, ¶ 22 (citations omitted). Other types of conduct evidencing a high degree of risk include "starting a fire at the front door of an occupied dwelling, shooting into the caboose of a passing train or into a moving automobile necessarily occupied by human beings, and driving a car at very high speeds along a main street." UJI 14-203 committee commentary (internal quotation marks and citation omitted). Thus, we have looked to the "number of persons exposed to danger by a defendant's extremely reckless behavior." UJI 14-203 committee commentary (internal quotation marks and citations omitted). This Court appeared to momentarily abandon the first indicator in *State v. Brown*, when it announced that "the number of persons may be

10

a factor in assessing the degree of the *risk* disregarded . . . [but] should not be determinative of the degree of *murder* charged." 1996-NMSC-073, ¶ 14, 122 N.M. 724, 931 P.2d 69 (omission in original) (internal quotation marks and citation omitted). The Court subsequently clarified, however, that it was declining to depart from prior precedent, and would continue to limit depraved mind murder to acts dangerous to more than one person. *Reed*, 2005-NMSC-031, ¶ 37.

{12}    Second, depraved mind murder requires an intentional act of "extremely reckless character." *Dowling*, 2011-NMSC-016, ¶ 11. The act must be "greatly dangerous to the lives of others." UJI 14-203. "[T]he accused must subjectively intend to commit an act that has a great likelihood of resulting in death." *Dowling*, 2011-NMSC-016, ¶ 11 (alteration in original) (internal quotation marks and citation omitted). The act must be "outrageously reckless," as "[m]ere negligence or recklessness is not enough." UJI 14-203.

{13}    Third, depraved mind murder requires "proof that the defendant had subjective knowledge that his act was greatly dangerous to the lives of others." *Reed*, 2005-NMSC-031, ¶ 23 (internal quotation marks and citation omitted). As noted above, both first-degree depraved mind murder and second-degree murder require that a defendant *know* the possible consequences of the defendant's act. *See Suazo*, 2017-

NMSC-011, ¶ 16. Subjective knowledge requires that a defendant know that his act is greatly dangerous to the lives of others, but the "defendant does not have to actually know that his victim will be injured by his act." *State v. Ibn Omar-Muhammad*, 1985-NMSC-006, ¶ 21, 102 N.M. 274, 694 P.2d 922, *holding modified on other grounds by State v. Cleve*, 1999-NMSC-017, ¶ 22, 127 N.M. 240, 980 P.2d 23. "The required mens rea element of 'subjective knowledge' serves as proof that the accused acted with 'a depraved mind' or 'wicked or malignant heart' and with utter disregard for human life." UJI 14-203 committee commentary (emphasis, internal quotation marks, and citation omitted). Because the subjective knowledge requirement is the same for first-degree depraved mind murder and second-degree murder, the only distinguishing factor in this regard is a defendant's knowledge that the defendant's act is greatly dangerous to the life of more than one person. *Cf.* Section 30-2-1(B) (providing that second-degree murder encompasses acts that create a strong probability of death or great bodily harm to an individual or another person).

{14}     That leaves us with the fourth primary indicator our Court has used to distinguish depraved mind murder—"an intensified malice or evil intent." *Reed*, 2005-NMSC-031, ¶ 24 (internal quotation marks and citation omitted). As explained in our depraved mind murder instruction, depraved mind murder requires that a

12

defendant "intentionally engag[e] in outrageously reckless conduct with a depraved kind of wantonness or total indifference for the value of human life." UJI 14-203; *see Reed*, 2005-NMSC-031, ¶ 24. "In addition, the defendant must have a corrupt, perverted, or malicious state of mind, such as when a person acts with ill will, hatred, spite, or evil intent." UJI 14-203. "Whether a person acted with a depraved mind may be inferred from all the facts and circumstances of the case." *Id.* Today, as in the past, the four primary indicators guide our analysis of Defendant's conviction for depraved mind murder.

**B.     The Evidence is Sufficient to Support Defendant's Conviction for First-degree Depraved Mind Murder**

{15}     Defendant claims there was insufficient evidence to support his conviction for first-degree depraved mind murder. We exercise our jurisdiction to review Defendant's conviction under Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A) NMRA (providing that this Court shall have jurisdiction over appeals of district court judgments imposing a sentence of death or life imprisonment).

> Under a sufficiency of evidence analysis, we must determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." We must view the evidence in

13

the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of the verdict. It is this Court's duty on review to determine whether *any* rational jury could have found the essential facts to establish each element of the crime beyond a reasonable doubt.

*Reed*, 2005-NMSC-031, ¶ 14 (citations omitted).

{16} We have affirmed depraved mind murder convictions in many instances. *See State v. Sena*, 1983-NMSC-005, ¶¶ 2, 9, 11, 99 N.M. 272, 657 P.2d 128 (affirming depraved mind murder conviction where the defendant opened fire on the doorman of a bar, hitting the doorman, but also hitting and killing an innocent bystander); *State v. McCrary*, 1984-NMSC-005, ¶¶ 2-3, 5, 25, 100 N.M. 671, 675 P.2d 120 (affirming depraved mind murder conviction where the defendant discharged about twenty-five shots into tractor-trailers and cabs parked at a carnival site during the night); *State v. Trujillo*, 2002-NMSC-005, ¶¶ 22, 28, 131 N.M. 709, 42 P.3d 814 (concluding the evidence was sufficient to support a depraved mind murder conviction where the defendant opened fire from a second floor balcony into a group of people below, killing a rival gang member).

{17} We have also reversed convictions when it was appropriate to do so. *See Ibn Omar-Muhammad*, 1985-NMSC-006, ¶¶ 15, 27 (reversing depraved mind murder conviction where depraved mind jury instruction set forth an objective standard of

14

knowledge rather than a subjective standard); *State v. Hernandez*, 1994-NMSC-045, ¶¶ 8-9, 117 N.M. 497, 873 P.2d 243 (reversing depraved mind murder conviction where the depraved mind act did not proximately cause the death of the victim); *Brown*, 1996-NMSC-073, ¶¶ 34-35 (reversing depraved mind murder conviction where the defendant was improperly denied jury instruction on intoxication); *Reed*, 2005-NMSC-031, ¶¶ 27, 44 (concluding the evidence was insufficient to support a depraved mind murder conviction where the defendant was playing with a gun, loaded it, and "absent-mindedly" fired in the direction of his friend); *Dowling*, 2011-NMSC-016, ¶¶ 15, 17 (reversing depraved mind murder conviction where jury instruction for depraved mind murder misstated extent of "recklessness" required for conviction).

{18}    We review the elements of depraved mind murder and determine whether the evidence here supports such a conviction. For the reasons that follow, we conclude that the facts of this case squarely fit within the contours of our clearly established precedent as set forth in this opinion. That being the case, we will not disturb the jury's verdict. To convict Defendant of depraved mind murder, the jury was required to find the following:

> 1. The defendant discharged a firearm at a car full of people;

15

2. The defendant's act caused the death of Sunni Reza;

3. The act of the defendant was greatly dangerous to the lives of others, indicating a depraved mind without regard for human life;

4. The defendant knew that his act was greatly dangerous to the lives of others;

5. The defendant did not act in self-defense or defense of another;

6. This happened in New Mexico on or about the 31[st] day of May, 2013.

A person acts with a depraved mind by intentionally engaging in outrageously reckless conduct with a depraved kind of wantonness or total indifference for the value of human life. Mere negligence or recklessness is not enough. In addition, the defendant must have a corrupt, perverted, or malicious state of mind, such as when a person acts with ill will, hatred, spite, or evil intent. Whether a person acted with a depraved mind may be inferred from all the facts and circumstances of the case.

*See* UJI 14-203.

{19}     Defendant does not deny that he discharged his weapon. In fact, he admitted to police that he fired two shots in the air and two shots at Rudy's vehicle, knowing that there were multiple people in the vehicle. Also, Richard Sr. testified that Defendant told Richard Sr. he fired the gun. Defendant claims, however, that he did so in self-defense and the defense of others in his group. Defendant argues that due to Rudy's actions towards Defendant and those in his group in the first encounter he

16

believed Rudy had returned to fight and they were prepared to defend themselves in the second encounter.

{20} Defendant stated to police that during the second encounter he saw a "guy" jump out of the vehicle from the front passenger seat with a machine gun. He also told police that this person was pointing a rifle straight at him. He said he heard someone saying "shoot" and that he believed he was under assault from a rifle. David Jr. corroborated Defendant's testimony in testifying that he saw someone from Rudy's group pointing what he thought looked like a handgun or rifle at them, and that Defendant returned fire. David Jr. claims Defendant did so to protect him and the others in Defendant's group. Also, witness statements were admitted into evidence that someone from Rudy's vehicle may have had a weapon and perhaps fired shots at Defendant's group. Defendant argues that because he was attempting to defend himself and others, he could not have had the necessary "intensified malice or evil intent," to prove depraved mind murder. *Suazo*, 2017-NMSC-011, ¶ 22 (internal quotation marks and citation omitted). We reject this argument. There was sufficient evidence for the jury to find Defendant acted with a depraved mind, despite Defendant's self-defense theory. *See* UJI 14-203 ("Whether a person acted with a depraved mind may be inferred from all the facts and circumstances of the case.")

17

When reviewing the sufficiency of the evidence to support Defendant's conviction, we must resolve all disputed facts in favor of the State. *Reed*, 2005-NMSC-031, ¶ 14.

**1. Defendant's act was greatly dangerous to the life of more than one person**

{21} Rudy testified that he picked up three passengers at the community center—Troy, Logan, and Sunni—and that they were occupying the vehicle when Defendant began shooting at them. Clearly, Defendant's act of shooting at Rudy's vehicle was greatly dangerous to the life of more than one person.

**2. Defendant's act was outrageously reckless**

{22} The jury heard testimony from David Jr. that Defendant fired his handgun twice into the air and twice at Rudy's vehicle. One of the shots went through the windshield, killing Sunni. As we acknowledged in *Reed*, in the few cases "in which we have affirmed depraved mind murder convictions involving the discharge of firearms, the defendant either admitted, or witnesses testified, that the defendant intentionally fired a weapon under circumstances showing an extreme degree of recklessness." 2005-NMSC-031, ¶ 33. Such examples include "shooting several times from a balcony of an apartment building into a crowd, killing a rival gang member"; "moving slowly around tractor-trailers parked overnight at a fairground with multiple firearms, shooting twenty-five times into the cabs, and killing a woman in a sleeping

18

compartment"; and "firing four or five times into a crowded bar, killing a bystander." *Id.* (citations omitted). "In each instance, there was no question that the defendant acted intentionally in firing the weapon." *Id.* From the evidence presented, the jury could have reasonably come to the same conclusion in the instant case. "[D]epraved mind murder involves an intentional act without regard for consequences." *Id.* ¶ 25. Shooting at a vehicle full of people qualifies as "outrageously reckless conduct with a depraved kind of wantonness or total indifference for the value of human life." UJI 14-203.

**3.      Defendant knew that his act was greatly dangerous to the lives of others**

{23}      Although Defendant may not have known a child was in Rudy's vehicle, the State presented evidence that Defendant knew there were multiple passengers. *See Ibn Omar-Muhammad*, 1985-NMSC-006, ¶ 21 ("A defendant does not have to actually know that his victim will be injured by his act."). Rudy testified that he told Defendant's group he was going to pick up friends and his vehicle was full. Richard Sr. and Richard Jr. said the group watched Rudy pick up more than one person at the community center.

{24}      Defendant's statements to the police provide additional bases for the jury to find Defendant had subjective knowledge of the risk he posed to the lives of those in

19

Rudy's vehicle. Defendant told police that he saw Rudy pick up a "carload of dudes" at the community center, so he knew the vehicle contained multiple passengers. In explaining the second encounter, Defendant admitted that he gave Rudy's group a warning shot and then "tried to shoot the car in the front headlight to scare him." These statements arguably "confirm[] . . . [D]efendant's personal desire to undertake acts that gave rise to dangerous circumstances." *Dowling*, 2011-NMSC-016, ¶ 25. "In such situations, it is evident that the very design of . . . [D]efendant's conduct [was] to frighten or injure someone by exposing others to dangerous acts, thereby permitting a clear inference of subjective knowledge." *Id.*

**4.      Defendant acted with a depraved mind**

{25}      The circumstances of the depraved mind act alone, may, in some cases, be sufficient to support the inference that a defendant acted with a depraved mind. *See Dowling*, 2011-NMSC-016, ¶ 45. Although there may have been no "external indicia of . . . [D]efendant's depravity, such as personal animus, the absence of such factors does not preclude the finding of a depraved mind." *Id.* The jury did, however, hear testimony from Rudy that Defendant's group was "mad" that Rudy refused to give them a ride. Additionally, Defendant admitted to police that he "tried to shoot the car in the front headlight to scare [Rudy's group]." Jurors reasonably could have accepted

these statements as evidence of depravity.

{26}   As far as Defendant's argument that he could not have been acting with a depraved mind because he was acting in self-defense, the jury was free to reject Defendant's self-defense theory. Defendant's statements to police and David Jr.'s testimony were countered by additional evidence and testimony that no one in Rudy's vehicle had a weapon of any kind. Additionally, detectives testified that apart from Defendant's gun and casings, no other weapons or casings were found. Further, no gun residue was found in Rudy's vehicle. As the State points out, "the jury was entitled to believe the great weight of the evidence—that no one in [the] car had a gun—and to disbelieve any evidence to the contrary." *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 ("[T]he jury is free to reject Defendant's version of the facts."). Furthermore, even if the jury believed Defendant was put in fear by the apparent danger presented by Rudy's group, the jury could have found that Defendant's act of firing his handgun into a vehicle occupied by unarmed people was excessive and unreasonable under the circumstances. *See* UJI 14-5171 NMRA (providing that self-defense requires a finding that a "reasonable person in the same circumstances as the defendant would have acted as the defendant did"). Accordingly, the evidence supports Defendant's conviction for depraved mind murder and we

21

affirm.

**C.** **The Evidence is Sufficient to Support Defendant's Aggravated Assault Convictions**

{27} We now turn to Defendant's three aggravated assault convictions. Defendant was convicted under NMSA 1978, Section 30-3-2(A) (1963) for "unlawfully assaulting or striking at another with a deadly weapon." To convict Defendant of aggravated assault, the jury was required to find the following:

1. The defendant discharged a firearm;

2. The defendant's conduct caused Rudy Chavez-Montoya [Logan Fontenelle] [Troy Fontenelle] to believe the defendant was about to intrude on Rudy Chavez-Montoya's [Logan Fontenelle's] [Troy Fontenelle's] bodily integrity or personal safety by touching or applying force to Rudy Chavez-Montoya [Logan Fontenelle] [Troy Fontenelle] in a rude, insolent or angry manner;

3. A reasonable person in the same circumstances as Rudy Chavez-Montoya [Logan Fontenelle] [Troy Fontenelle] would have had the same belief;

4. The defendant used a firearm;

5. The defendant did not act in self-defense or defense of another;

6. This happened in New Mexico on or about the 31[st] day of May, 2013.

*See* UJI 14-305 NMRA. Defendant admitted to police that he discharged his

22

firearm—twice in the air and twice at Rudy's vehicle. At trial, David Jr. testified that Defendant fired twice in the air and twice at Rudy's vehicle. Rudy testified that he, Logan, Troy, and Sunni were occupying the vehicle when Defendant began shooting at them. The evidence was such that the jury could have concluded that Defendant's act of shooting at Rudy's vehicle caused the occupants of the vehicle to believe Defendant was about to intrude on their "bodily integrity or personal safety." UJI 14-305. As with depraved mind murder, the jury was free to reject Defendant's self-defense theory. *See State v. Fox*, 2017-NMCA-029, ¶ 12, 390 P.3d 230. We conclude there was sufficient evidence to support the aggravated assault convictions.

**D.**     **The District Court's Failure to Give the Jury the No-Retreat Instruction Was Not Fundamental Error**

{28}     At trial, the district court determined that Defendant was entitled to jury instructions on self-defense and defense of another. *See* UJI 14-5171; UJI 14-5172 NMRA (containing elements of self-defense and defense of another as set forth in NMSA 1978, Section 30-2-7(A)-(B) (1963)); *State v. Ellis*, 2008-NMSC-032, ¶ 15, 144 N.M. 253, 186 P.3d 245 ("When asserting self-defense against a private citizen . . . a defendant has an *unqualified* right to a self-defense instruction in a criminal case when there is evidence which supports the instruction." (internal quotation marks and

citation omitted)); *State v. Sandoval*, 2011-NMSC-022, ¶ 16, 150 N.M. 224, 258 P.3d 1016 ("[C]ase law and commentary treat 'defense of another' and 'self-defense' as virtually identical for purposes of analysis. . . . [A]ssertions made regarding self-defense instructions are also assumed to apply to defense of another instructions." (first alteration in original) (internal quotation marks and citations omitted)).

{29}   At the charging conference, the district court, counsel for Defendant, and counsel for the State discussed the jury instructions to be proffered. The district court concluded that the "appearance of immediate danger of death or great bodily harm," contained in the first element of the self-defense and defense of another instructions would be Logan's act of pointing/shooting at Defendant's group during the second encounter. UJI 14-5171; UJI 14-5172. The jury was not given a self-defense instruction citing Rudy's alleged act of attempting to run over Defendant's group in the first encounter as the cause of the "appearance of immediate danger of death or great bodily harm," because Defendant's shooting was too removed in time from the first encounter with Rudy to cause "immediate" danger. UJI 14-5171; UJI 14-5172. The State argued, and the district court agreed, that too much time had passed between the first encounter and the second encounter to warrant such an instruction.

{30}   The State introduced witness statements to the police that during the second

24

encounter, when the shooting occurred, Rudy or someone in Rudy's vehicle may have had a weapon and may have been shooting from the vehicle. Richard Sr. testified that it looked like the driver and passenger were hiding behind their vehicle doors at some point. Defendant told the police that the front passenger exited the vehicle with a machine gun and also said that the passenger pointed a rifle straight at him. David Jr. testified that the front passenger exited the vehicle and had something in his hands, possibly a handgun or rifle. The following instructions were given to the jury:

> Evidence has been presented that the defendant killed Sunni Reza in self-defense.
>
> The killing is in self-defense if:
>
> 1. There was an appearance of immediate danger of death or great bodily harm to the defendant as a result of Logan Fontenelle pointing and/or shooting a firearm at the defendant; and
>
> 2. The defendant was in fact put in fear by the apparent danger of immediate death or great bodily harm and shot at the vehicle which caused the death of Sunni Reza because of that fear;
>
> 3. A reasonable person in the same circumstances as the defendant would have acted as the defendant did.
>
> The burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self defense [sic]. If you have a reasonable doubt as to whether the defendant acted in self-defense you must find the defendant not guilty.

*See* UJI 14-5171.

Evidence has been presented that the defendant killed Sunni Reza while defending another.

The killing was in defense of another if:

1. There was an appearance of immediate danger of death or great bodily harm to Richard Turrieta Sr., Richard Turrieta Jr., and David Candelaria Jr. as a result of Logan Fontenelle pointing and/or shooting a firearm at Richard Turrieta Sr., Richard Turrieta Jr., and David Candelaria Jr.; and

2. The defendant believed Richard Turrieta Sr., Richard Turrieta Jr., and David Candelaria Jr. were in immediate danger of death or great bodily harm from Logan Fontenelle, and shot at the vehicle which caused the death of Sunni Reza to prevent the death or great bodily harm; and

3. The apparent danger to Richard Turrieta Sr., Richard Turrieta Jr., and David Candelaria Jr. would have caused a reasonable person in the same circumstances to act as the defendant did.

The burden is on the state to prove beyond a reasonable doubt that the defendant did not act in defense of another. If you have a reasonable doubt as to whether the defendant acted in defense of another, you must find the defendant not guilty.

*See* UJI 14-5172.

{31} Defendant argues that in addition to the instructions given above, the district court should have also provided the jury with UJI 14-5190 NMRA— the "stand-your-ground" (no-retreat) instruction: "A person who is threatened with an attack need not

26

retreat. In the exercise of his right of self defense, he may stand his ground and defend himself." The propriety of the jury instructions given by the district court is a mixed question of law and fact requiring de novo review. *See State v. Lucero*, 2010-NMSC-011, ¶ 11, 147 N.M. 747, 228 P.3d 1167. Because this issue was not raised at trial, we review for fundamental error. *See* Rule 12-321(B)(2)(c) NMRA (2016).

> Error that is fundamental must be such error as goes to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive. Fundamental error only applies in exceptional circumstances when guilt is so doubtful that it would shock the judicial conscience to allow the conviction to stand.

*State v. Johnson*, 2010-NMSC-016, ¶ 25, 148 N.M. 50, 229 P.3d 523 (citation omitted).

> In reviewing the self-defense and defense of another jury instructions for fundamental error, we first determine "whether a reasonable juror would have been confused or misdirected by the jury instructions." If we conclude that a reasonable juror would have been confused or misdirected, then we "review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the defendant's conviction was the result of a plain miscarriage of justice."

*Sandoval*, 2011-NMSC-022, ¶ 20 (alterations and citations omitted). "For fundamental error to exist, the instruction given must differ materially from the

uniform jury instruction, omit essential elements, or be so confusing and incomprehensible that a court cannot be certain that the jury found the essential elements under the facts of the case." *State v. Caldwell*, 2008-NMCA-049, ¶ 24, 143 N.M. 792, 182 P.3d 775 (internal quotation marks and citations omitted). "[J]uror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134.

{32}    Defendant relies on *State v. Anderson*, 2016-NMCA-007, 364 P.3d 306 to argue that the district court's failure to provide the jury with the no-retreat instruction mandates reversal of Defendant's conviction for depraved mind murder. In *Anderson*, the victim and the defendant were at a party and began arguing. 2016-NMCA-007, ¶ 3. The victim's girlfriend attempted to intervene and the defendant moved her out of the way. *Id.* The victim punched the defendant, causing the defendant to fall backward into another room. *Id.* A brawl then began between others at the party. *Id.* The victim's girlfriend, having retrieved a handgun from the victim, then brandished it and brought the brawl to a standstill. *Id.* While the brawl had ceased, the defendant "removed himself and hid behind the doorway of the room into which he fell where

28

he, too, drew a handgun." *Id.* The defendant, believing the victim had taken the gun from his girlfriend, came out from the doorway "with his gun raised and fired six shots from a distance of approximately two to three feet, four of which hit [the victim]." *Id.* The victim died and the defendant was charged with his murder. *Id.*

{33} In that case, the defendant requested a self-defense instruction and the no-retreat instruction, and the district court agreed they should be given. *Id.* ¶ 5. *See* UJI 14-5171; UJI 14-5190. Due to an oversight on the part of the district court and counsel, the no-retreat instruction was not given to the jury. *See Anderson*, 2016-NMCA-007, ¶ 6. During deliberations, the jury asked if there was a "stand-your-ground" law in New Mexico, but ultimately withdrew the question. *Id.*

{34} Our Court of Appeals concluded in *Anderson* that the no-retreat instruction was critical to the jury's self-defense determination, and the district court's failure to provide the instruction was fundamental error requiring the reversal of the defendant's murder conviction. *Id.* ¶¶ 14, 19. The Court likened the no-retreat instruction to a missing elements instruction, necessarily informing jurors of the meaning of "reasonable" under the third prong of the self-defense instruction. *Id.* ¶ 15. *See* UJI 14-5171 ("A reasonable person in the same circumstances as the defendant would have acted as the defendant did."). The Court explained that

29

" 'reasonable' . . . carries a different meaning when read in conjunction with the no-retreat instruction than it does alone." *Anderson*, 2016-NMCA-007, ¶ 15 ("Read alone, a person exercising the 'degree of attention, knowledge, intelligence, and judgment that society requires of its members' is acting reasonably. . . . When read together with the no-retreat instruction, however, a person who, when threatened with an attack, does not retreat and stands his ground when exercising his right of self-defense is acting reasonably." (citations omitted)). Accordingly, the Court determined that "the jury's understanding of all of the elements of the law governing self-defense was deficient." *Id.* ¶ 12. The Court further concluded "not only that a reasonable juror would have been misdirected by the jury instructions given, but also that the jury in [the d]efendant's case was misdirected." *Id.*

{35} Before we consider the question of whether the omission of the no-retreat instruction in Defendant's case was fundamental error, we must first apply the standard for reversible error. *Anderson*, 2016-NMCA-007, ¶ 9. We determine if "a reasonable juror would have been confused or misdirected by the jury instructions that were given." *Id.* (internal quotation marks and citation omitted). In Defendant's case, the jury was properly instructed on self-defense and defense of another, and we conclude that a reasonable juror would not have been "confused or misdirected" by

30

the omission of the no-retreat instruction. *Sandoval*, 2011-NMSC-022, ¶ 20; *see State v. Cunningham*, 2000-NMSC-009, ¶ 14, 128 N.M. 711, 998 P.2d 176. We agree with our Court of Appeals that "[w]here the evidentiary basis for the [no-retreat] instruction has been laid," the instruction "alters what 'reasonable' means" under the third prong of the self-defense instruction. *Anderson*, 2016-NMCA-007, ¶ 14. Here, however, the evidentiary basis for the no-retreat instruction was not laid. That being the case, the district court did not err by failing to provide the jury with the no-retreat instruction even though it determined that the self-defense and defense of another instructions were warranted. *See State v. Heisler*, 1954-NMSC-032, ¶ 23, 58 N.M. 446, 272 P.2d 660 ("[W]here self-defense is involved in a criminal case and there is any evidence, although slight, to establish the same, it is not only proper for the court, but its duty as well, to instruct the jury fully and clearly on all phases of the law on the issue *that are warranted by the evidence . . . .*" (emphasis added)); *Benally*, 2001-NMSC-033, ¶ 12 (emphasizing the importance of providing jurors with "an accurate rendition of the relevant law").

{36}     Unlike *Anderson*, there is absolutely no indication of juror confusion in Defendant's case. Additionally, the district court in *Anderson* determined that there was sufficient evidence to support the issuance of the instruction, but by oversight,

31

did not give it. 2016-NMCA-007, ¶ 10; *see also id.* ¶ 19 ("[I]n light of the importance that self-defense and no-retreat had in [the d]efendant's case, allowing his conviction to stand without adequate jury instructions would undermine judicial integrity and the legitimacy of the jury's verdict."). Importantly, the defendant's self-defense theory in *Anderson* rested "on the argument that . . . he had no duty to retreat from the confrontation with [the victim]" in the case. *Id.* ¶ 14. Here, Defendant did not argue he had no duty to retreat from Rudy or Rudy's group, and the district court made no determination that the no-retreat instruction was warranted.

{37}    Defendant argues the no-retreat instruction was required because the prosecutor in closing told the jury that "it was not reasonable [for Defendant] to stand ones' [sic] ground because the Turrieta's [sic] were running in fear of being shot. Defendant argues this statement "almost forced the jury to find . . . Defendant's decision was not reasonable because there was nothing in the Self Defense Instruction stating . . . Defendant could lawfully choose to stand his ground and shoot back or shoot at the vehicle that had almost killed him, his son and their companions." As the State points out, Defendant's characterization of the prosecutor's statement in closing is misleading. The transcript reveals that the prosecutor said the following: "You heard how the Turrietas responded; they booked it. Does a reasonable person, even thinking

32

there's an appearance of immediate danger, fire at the vehicle? They do not. They do not." We agree with the State that the prosecutor's statement does not appear to be a comment on Defendant's duty to retreat, but rather, the reasonableness of Defendant's act of shooting at the vehicle. As the State correctly identifies, "Defendant has not pointed to anything in the record to show that a no-duty-to-retreat argument formed any part of his theory of the case."

{38} Had we determined that it was error for the district court to fail to provide the no-retreat instruction, *Anderson* instructs us that the next step in the fundamental error analysis is to "consider all the facts and circumstances and decide whether the missing instruction caused such confusion that the jury could have convicted Defendant based upon a deficient understanding of the law regarding self-defense." *Id.* ¶ 13 (alteration, internal quotation marks, and citation omitted). Although we need not reach the second prong of the analysis, we note that based on the proffered self-defense and defense of another instructions and the evidence presented, it would not "shock the judicial conscience" to allow Defendant's conviction to stand, *Johnson*, 2010-NMSC-016, ¶ 25, nor would it constitute a "miscarriage of justice." *Sandoval*, 2011-NMSC-022, ¶ 20.

{39} Although there was an evidentiary basis to support the district court's

33

proffering of the self-defense and defense of another instructions, there was sufficient evidence to contradict those theories. Because there was not an evidentiary basis to support giving a self-defense instruction regarding Rudy's attempt to run over Defendant's group in the first encounter, the jury only had to decide whether Logan's act of pointing and/or shooting at Defendant's group, if the jury believed those acts occurred, warranted Defendant's gunfire in response. The State introduced a great deal of evidence, including corroborating testimony, that no one in Rudy's vehicle had a weapon and that no shots were fired at Defendant's group. To warrant the no-retreat instruction, one must be "threatened with an attack" and must be "exercis[ing] . . . his right of self-defense." UJI 14-5190. The jury was free to reject Defendant's self-defense theory and find that Defendant's firing shots at Rudy's vehicle and killing Sunni was unreasonable—that "[a] reasonable person in the same circumstances as the defendant would [not] have acted as the defendant did." UJI 14-5171. The jury instructions provided by the district court were accurate and clear. We therefore conclude, after reviewing the instructions in the context of the individual facts and circumstances of this case, that the missing instruction did not cause juror confusion such "that the jury could have convicted Defendant based upon a deficient understanding of the law regarding self-defense." *Anderson*, 2016-NMCA-007, ¶ 13

34

(alteration, internal quotation marks, and citation omitted). The district court's omission of the no-retreat instruction in this case does not rise to fundamental error. *See Anderson*, 2016-NMCA-007, ¶ 9; *Cunningham*, 2000-NMSC-009, ¶ 18 (distinguishing reversible error from fundamental error and noting that fundamental error requires heightened scrutiny). No-retreat was simply not at issue in this case and thus, no further clarification of *reasonable* under UJI 14-5190 was warranted. *See State v. Barber*, 2004-NMSC-019, ¶ 26, 135 N.M. 621, 92 P.3d 633 (concluding that "missing definition of possession" did not "implicate a critical determination akin to a missing elements instruction," and "no distinct possibility exist[ed] from the evidence that the jury convicted [the d]efendant without finding all the elements beyond a reasonable doubt" (internal quotation marks and citation omitted)).

**E.      The District Court Did Not Abuse Its Discretion in Admitting the Testimony of Richard Turrieta, Sr.**

**{40}**      Defendant claims the district court erred in allowing Richard Sr. to testify while he was under the influence of pain medication. The State called Richard Sr. to the stand on the fourth day of the trial and proceeded with its direct examination. At the end of the direct examination, the State asked Richard Sr. if he was on any medications. Richard Sr. responded that he was. In beginning his cross-examination,

35

counsel for Defendant asked Richard Sr. to provide further explanation about his medications. Richard Sr. testified he was taking hydrocodone for pain. Counsel for Defendant approached the bench, questioning Richard Sr.'s competency to testify. Because a full direct examination had already taken place, the district court instructed counsel to address his concerns in his cross-examination. On cross, Richard Sr. testified that the medication caused memory loss, drowsiness, and tiredness, but that he was "okay" and remembered the incident clearly.

{41} Defendant represents to the Court that after the direct examination of Richard Sr., defense counsel requested a mistrial or the suppression of Richard Sr.'s testimony. Defendant's assertion is not supported by the record or transcripts. Although counsel for Defendant questioned Richard Sr.'s competency before the district court, counsel made no motion to exclude Richard Sr.'s testimony, nor did counsel move for a mistrial. Defense counsel simply continued with his cross-examination, appearing satisfied by the judge's decision and Richard Sr.'s answers to the questions about his medication.

{42} We review a district court's determination as to the competency of a witness to testify under an abuse of discretion standard. *See State v. Perez*, 2016-NMCA-033, ¶ 11, 367 P.3d 909. "An abuse of discretion occurs when the ruling is clearly against

36

the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *Rojo*, 1999-NMSC-001, ¶ 41 (internal quotation marks and citations omitted). After reviewing the transcripts of the proceedings, we conclude that the district court did not abuse its discretion in admitting Richard Sr.'s testimony.

{43}	There is a general presumption that all persons are competent to be witnesses. *See State v. Ruiz*, 2007-NMCA-014, ¶ 23, 141 N.M. 53, 150 P.3d 1003; Rule 11-601 NMRA. "Trial courts have broad discretion to determine the competency of a witness . . . ." *Apodaca v. AAA Gas Co.*, 2003-NMCA-085, ¶ 60, 134 N.M. 77, 73 P.3d 215. The district court must only ensure that a witness "meets a minimum standard, such that a reasonable person could put any credence in their testimony." *Ruiz*, 2007-NMCA-014, ¶ 23 (internal quotation marks and citation omitted). This determination includes an inquiry into the "witness's capacities to observe, recollect, and communicate, as well as appreciate a duty to speak the truth at the meaningful time." *Apodaca*, 2003-NMCA-085, ¶ 62.

{44}	Defendant claims he was prejudiced by Richard Sr.'s inaccurate recollection of the events that took place on the date of the incident due to the pain medication

Richard Sr. was taking when he testified. As a result, Defendant argues, the jury received "incompetent and misleading facts." Defendant also argues that the fact Richard Sr. admitted to smoking marijuana on the day of the incident in question makes him incompetent as a witness. We reject these arguments.

{45} Reviewing the transcript of Richard Sr.'s testimony, he did not appear to have any difficulty answering questions. Clearly, Richard Sr. met the threshold requirements to testify as a witness. *See Apodaca*, 2003-NMCA-085, ¶ 62. Furthermore, counsel for Defendant waited until the entire direct examination was complete before inquiring about Richard Sr.'s competency, and then made no motion to exclude it. *See id.* ("[T]he party challenging competency bears the burden to show the witness is incompetent." (citation omitted)). Finally, Defendant's arguments that the district court should have excluded Richard Sr.'s testimony suggest that the district court must make a credibility analysis of each witness before allowing the witness to testify. This simply is not the case. "The jury alone is the judge of the credibility of the witnesses and determines the weight afforded to testimony." *Ruiz*, 2007-NMCA-014, ¶ 23 (internal quotation marks and citation omitted). The district court must only ensure that the witness appreciates the duty to speak the truth. *See Apodaca*, 2003-NMCA-085, ¶ 62. The district court did not abuse its discretion when

it admitted Richard Sr.'s testimony.

**F. Defendant's Claim of Ineffective Assistance of Counsel Was Not Adequately Developed and Will Not Be Considered on Direct Appeal**

{46} Defendant claims his trial counsel was ineffective for not requesting a mistrial on multiple occasions during the proceedings. For example, Defendant cites to several instances of misconduct by the State's witnesses in his statement of issues to this Court, which he claims support a mistrial, but he does not address those in his briefs. Defendant also directs the Court to other instances where a mistrial may have been pursued, but does not clearly articulate these instances or make any arguments to support these claims. That being the case, we decline to consider them here. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("This Court requires that the parties adequately brief all appellate issues to include an argument, the standard of review, and citations to authorities for each issue presented. . . . We will not review unclear arguments, or guess at what a party's arguments might be. . . . To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the parties' work for them. . . . This creates a strain on judicial resources and a substantial risk of error. It is of no benefit either to the parties or to future litigants for this Court to promulgate

39

case law based on our own speculation rather than the parties' carefully considered arguments." (alteration, internal quotation marks, and citations omitted)).

## III.   CONCLUSION

{47}   For the foregoing reasons, Defendant's convictions are affirmed.

{48}   **IT IS SO ORDERED.**

_____

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____

**JUDITH K. NAKAMURA, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**CHARLES W. DANIELS, Justice**

_____

**GARY L. CLINGMAN, Justice**