STATE V. COBOS

This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**STATE OF NEW MEXICO,**
**Plaintiff-Appellee,**
**v.**
**ANTONIO G. COBOS,**
**Defendant-Appellant.**

Docket No. A-1-CA-35585
COURT OF APPEALS OF NEW MEXICO
May 28, 2019

APPEAL FROM THE DISTRICT COURT OF DOŃA ANA COUNTY, Marci E. Beyer, District Judge

**COUNSEL**

Hector H. Balderas, Attorney General, Maris Veidemanis, Assistant Attorney General, Santa Fe, NM for Appellee

Bennett J. Baur, Chief Public Defender, Kimberly Chavez-Cook, Assistant Appellate Defender, Santa Fe, NM for Appellant.

**JUDGES**

M. MONICA ZAMORA, Chief Judge. WE CONCUR: JENNIFER L. ATTREP, Judge, ZACHARY A. IVES, Judge

**AUTHOR:** M. MONICA ZAMORA

**MEMORANDUM OPINION**

**M. ZAMORA, Chief Judge.**

**{1}** Antonio G. Cobos (Defendant) appeals his conviction of second-degree felony embezzlement (over $20,000), pursuant to NMSA 1978, Section 30-16-8(F) (2007). Defendant asserts that (1) the district court erred by denying Defendant's motion to dismiss for violation of the Interstate Agreement on Detainers (IAD), NMSA 1978, § 31-5-12 (1971); (2) the district court committed fundamental error by allowing the State's

superseding information charging embezzlement; and (3) the State failed to prove embezzlement. We conclude the first two claims of error lack merit. As to the third claim of error, we conclude there was only sufficient evidence to support a conviction for fourth-degree embezzlement (over $500, but not more than $2,500). We reserve discussion of the facts for our analysis of each issue.

**DISCUSSION**

**I.      The District Court Did Not Err in Denying Defendant's Motion to Dismiss for Violation of the Interstate Agreement on Detainers**

**{2}**     Defendant was in federal custody in Texas on unrelated charges when he was indicted in this case. On April 10, 2015, he was brought to New Mexico under the IAD. *See* § 31-5-12 (governing interstate transfer of detainees awaiting trial). On April 16, 2015, Defendant filed a waiver of arraignment. On April 17, 2015, the district court entered a stipulated order of continuance of pre-trial conference because there were on-going plea negotiations, resetting the conference to July 2, 2015. On July 2, 2015, the district court entered another stipulated order of continuance of pre-trial conference because of on-going discovery and Defendant was awaiting a plea offer, setting the conference to July 20, 2015. It appears from the record that the July 20, 2015, pre-trial conference did not take place and the matter was reset for August 7, 2015. On August 6, 2015, the State filed a motion for continuance in order to obtain financial records for the purpose of seeking restitution. Defendant did not respond to the motion. On August 7, 2015, the district court granted the State's motion and then reset the change of plea hearing for August 17, 2015. A change of plea did not occur on August 17, 2015, and the district court instead set the trial for October 5-6, 2015. On September 16, 2015, the State moved to continue the trial setting due to the unavailability of the case agent. On October 1, 2015, the district court found good cause for the continuance and granted the State's motion. On November 12, 2015, Defendant filed a motion to dismiss for alleged violations of the IAD. The district court denied the motion, finding that the two stipulated continuance requests extended the detainer clock until October 23, 2015, and the district court's October 1, 2015, continuance was timely made within the applicable 120-day period.

**{3}**     The IAD "prescribes procedures by which . . . a state may obtain for trial a prisoner who is incarcerated in another state." *State v. Livernois*, 1997-NMSC-019, ¶ 23, 123 N.M. 128, 934 P.2d 1057 (internal quotation marks and citation omitted); *see* § 31-5-12. The IAD in relevant part states that "trial shall be commenced within one hundred twenty days of the arrival of the prisoner in the receiving state, but for good cause shown in open court . . . the court having jurisdiction of the matter may grant any necessary or reasonable continuance." Section 31-5-12, Art. 4(C). The IAD further explains that the running of this time period "shall be tolled whenever and for as long as the prisoner is unable to stand trial." Section 31-5-12, Art. 6.

**{4}**     In *State v. Shaw*, 1982-NMCA-133, 98 N.M. 580, 651 P.2d 115, the defendant, in the custody of the State of New Mexico under the IAD, filed numerous pre-trial motions

which in turn required pre-trial hearings, thereby resulting in a delay in the commencement of trial. *Id.* ¶¶ 1, 19. This Court rejected the State's argument that the defendant should be deemed to have consented to a continuance or to have waived the time limit because he filed pre-trial motions. *Id.* ¶ 19. In rejecting the State's argument, this Court noted that to agree with the State would be to penalize the defendant for doing what he needed to do procedurally within the context of his criminal proceedings. *Id.* ¶¶ 20-21. This Court held that the pretrial motions did not toll the time period under the IAD and that "time is tolled only when the prisoner is 'unable to stand trial.' " *Id.* ¶ 24 "[I]n all other circumstances, [the IAD] provides the mechanism for reasonably or necessarily extending the time limits by a request for continuance 'for good cause shown.' " *Id.* ¶ 24.

**{5}**     In *State v. Montoya*, 1994-NMCA-155, 119 N.M. 95, 888 P.2d 977, this Court again looked at whether dismissal for failure to comply with the time limits in the IAD was proper. *Id.* ¶ 1. In that case, the defendant moved twice for continuances of the trial setting, the defendant and state stipulated once to a continuance, and the state sought one other continuance. *Id.* ¶¶ 3-4. The defendant filed a motion to dismiss for failure to comply with IAD time limits. *Id.* ¶ 5. We reversed the district court's order granting the defendant's motion to dismiss the indictment for failure to comply with IAD time limits, holding that the defendant's requested continuance extended the IAD time limits. *Id.* ¶¶ 5, 11. We distinguished the case from *Shaw*, explaining that the defendant in *Montoya* affirmatively requested a continuance, while the defendant in *Shaw* only filed pre-trial motions. *Id.* ¶ 8. The defendant in *Montoya* also agreed to waive his right to a speedy trial. *Id.* ¶ 9. We held that although the defendant did not specifically waive the IAD time limitations, a waiver was implied in his waiver of speedy trial limitations. *Id.* ¶ 9. The IAD time limit was extended because the district court granted the continuance at the defendant's request. *Id.* ¶ 11.

**{6}**     Relying on *Shaw*, Defendant argues that the district court erred by tolling time during which Defendant was able to stand trial. Defendant contends that agreeing to continuances of pretrial conferences, while simultaneously requesting trial settings, did not render Defendant "unable to stand trial." We, however, see this case as more akin to *Montoya*. Because the State received custody of Defendant on April 10, 2015, trial was required to occur within 120 days, which would have been August 10, 2015. Section 31-5-12, Art. 4(C). By stipulating to two pre-trial conference continuances and failing to respond to the State's request for a continuance of the pre-trial conference or otherwise object to the continuance, Defendant acquiesced in continuing the time limits, which delayed bringing his case to trial and extended the IAD time provisions. *See Montoya*, 1994-NMCA-155, ¶ 8 ("Thus we see no reason why a defendant who is not prepared for trial may not waive the time limits of IAD . . . by affirmatively requesting a continuance."). Under the circumstances, we agree with the district court that the pre-trial continuances extended the 120-day period from August 10, 2015, to at least October 23, 2015. Thus, the district court's October 1, 2015 order, granting the State's continuance for good cause was within the IAD time limits. Defendant has not argued that the district court's determination of good cause was in error. Therefore, we affirm

the district court's denial of Defendant's motion to dismiss for violation of the IAD time limits.

## II. The District Court Did Not Commit Fundamental Error in Allowing the Superseding Embezzlement Charge

**{7}** Defendant was originally indicted on one count of fraud over $20,000, contrary to NMSA 1978, Section 30-16-6(F) (2006). On the morning of trial, the State filed a criminal information charging Defendant with a single count embezzlement over $20,000, contrary to Section 30-16-8(F), and replacing the grand jury charge of fraud. Defendant did not object, and waived arraignment and a preliminary hearing. The district court accepted the criminal information as a replacement for the indictment.

**{8}** On appeal, Defendant argues that the district court erred in allowing the State's subsequent criminal information charging embezzlement to supersede the grand jury's indictment on fraud without determining whether Defendant was prepared to defend against a second-degree embezzlement charge. Since Defendant did not object, we review for fundamental error. *See* Rule 12-216(B)(2) NMRA (1993, current version at Rule 12-321 NMRA) (providing an appellate court the discretion to review questions of fundamental error or fundamental rights as an exception to the preservation rule). "For an error to be deemed fundamental, it must go to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive." *State v. Romero*, 2013-NMCA-101, ¶ 8, 311 P.3d 1205 (internal quotation marks and citation omitted).

**{9}** Rule 5-204(C) NMRA permits amendment of the indictment or criminal information at trial only so long as it conforms with the evidence of the case and the particulars of the offense. "[U]nless such variance prejudices substantial rights of the defendant[,]" it is not "grounds for . . . acquittal." Rule 5-204(C). "Prejudice exists when the defendant is unable to reasonably anticipate from the indictment the nature of the proof the state will produce at trial." *Romero*, 2013-NMCA-101, ¶ 9.

**{10}** Critically, Defendant fails to show how the subsequent criminal information prejudiced his substantial rights. Defendant makes no showing that "his defense was in any way impaired" by going to trial for embezzlement instead of fraud. *State v. Meadors*, 1995-NMSC-073, ¶ 20, 121 N.M. 38, 908 P.2d 731. *Compare* § 30-16-8(A) ("Embezzlement consists of a person embezzling or converting to the person's own use anything of value, with which the person has been entrusted, with fraudulent intent to deprive the owner thereof."), *with* § 30-16-6(A) ("Fraud consists of the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representations."). Defendant makes no showing that he was unable to reasonably anticipate the nature of the proof the State would produce at trial. Absent some other showing of prejudice, we cannot say that permitting the superseding criminal information was fundamental error. *See Romero*, 2013-NMCA-

101, ¶ 9 ("In seeking acquittal, the defendant must demonstrate actual prejudice; the mere assertion of prejudice alone is insufficient to establish error warranting reversal.").

### III. There Is Only Sufficient Evidence to Support a Conviction for Fourth-Degree Embezzlement

{11}    Defendant entered into two contracts with Maribel Samaniego and Jesus "Mike" Zamora, husband and wife (collectively, Purchasers), involving real property in Chaparral, New Mexico (Property). The first contract, dated August 27, 2009, was entitled "Residential Lease-Purchase Agreement" and Defendant was identified as "Landlord" and Purchasers were identified as "Tenants." This agreement required that Tenants pay rent in monthly installments of $506.31 for a period 180 months amounting to a total of $91,136.54. Tenants also agreed to pay a non-refundable security deposit of $5,000 to Landlord, in two installments. After Tenants' final payment, "Landlord agrees to immediately sign and endorse a QUITCLAIM DEED, assigning and delivering ownership of the [Property] to [Purchasers]." At the time Purchasers entered into the first contract, they were aware that there was also a mortgage loan on the Property and that money was owed on that mortgage loan because it was specifically identified in the second contract described below.

{12}    The "Mobile Home Sales Contract" was the second contract, signed in September 2010, but backdated to August 27, 2009. It identified Purchasers as "Purchaser" and Defendant as "Seller" and included the mobile home located on the Property. The contract provided "[i]n consideration of the purchase price, immediate occupancy of [P]roperty, and performance of the covenants and agreements by the Purchaser herein set forth, the Seller does hereby sell unto the Purchaser, [Property and the mobile home located on Property]." Purchasers agreed "to fulfill [the] Chase Home Finance loan [(Chase mortgage)], in its entirety[] the current outstanding principal obligation [of] $41,360" plus interest for a term of 360 months. The second contract required Purchasers to make monthly principal and interest payments of $317.71. Purchasers also agreed to pay Defendant an additional $20,000 lump sum payment "for the purchase of the [P]roperty."

{13}    The Chase mortgage was in the name of Brenda Van Dyne, Defendant's stepmother, who had died. On March 7, 2013, Defendant sent a letter to Chase Bank informing the bank that the original mortgagor had died and explaining how he received a warranty deed to the Property. He also stated he wanted to continue paying the Chase mortgage and requested access to the details of the loan account. In June 2013 Purchasers were served with a complaint for foreclosure of the Property, declaring: "As of May 24, 2013, the Principal Balance due is $38,492.66, plus interest . . . from and including December 1, 2012, through and including May 25, 2013." A copy of the note was attached to the complaint, showing that the monthly Chase mortgage payment for the Property was $317.71. Ms. Samaniego testified at trial that she stopped making payments to Defendant after receiving the complaint for foreclosure. On July 10, 2014, Defendant's wife, as attorney-in-fact for Defendant, sent a letter to Chase Bank, identifying Chase mortgage payments Defendant submitted in December 2012 and

January 2013 as well as a double payment in March 2013. Subsequently, Defendant and his wife filed for bankruptcy and listed Purchasers as creditors with an unsecured claim in the amount of $20,000.

**{14}** At trial, Purchasers testified that they assumed that the Chase mortgage was in Defendant's name. Neither Purchaser had personal knowledge of what Defendant did with their payments once they were made to Defendant. Both Purchasers acknowledged that there was nothing in either contract specifically requiring that Defendant use the money they paid to pay the Chase mortgage. Purchasers nevertheless testified that they believed their monthly payments were going to the Chase mortgage. It was Purchasers' understanding from the contracts and conversations with Defendant that their payments would be used to pay the Chase mortgage. Purchasers further testified that Defendant told them that the additional $20,000 lump sum payment would get them out of the Mobile Home Sales Contract sooner because it brought down the total price of the mobile home from approximately $90,000 to $60,000. Defendant also told them that he needed the $20,000 to deal with a problem he was having in Texas.

**{15}** On appeal, Defendant argues that the evidence is insufficient to support his conviction for embezzlement. Defendant contends that money paid as an installment payment toward a purchase price is not "entrusted" for any particular use except to reduce the balance owed, and that the State did not put on any evidence that Defendant promised to use the Purchasers' monthly and lump sum payments for the sole purpose of paying the Chase mortgage. He asserts that there was no "entrustment" because the payments made toward the purchase of the Property became Defendant's money and therefore, the money could not be "converted." Defendant also contends that the State's circumstantial evidence of fraudulent intent was insufficient to support a conviction for embezzlement.

## A.    Standard of Review

**{16}** In reviewing the sufficiency of the evidence to support Defendant's conviction for embezzlement, "we must determine whether substantial evidence, either direct or circumstantial, exists to support a guilty verdict beyond a reasonable doubt for every essential element of the crimes at issue." *State v. Mercer*, 2005-NMCA-023, ¶ 13, 137 N.M. 36, 106 P.3d 1283. "We must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (internal quotation marks and citation omitted). Nevertheless, our appellate review requires "scrutiny of the evidence and supervision of the jury's fact-finding function to ensure that, indeed, a rational jury could have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (emphasis, internal quotation marks, and citation omitted). And "[t]he reviewing court must be able to articulate an analysis the jury might have used to determine guilt, and that analysis must be reasonable." *State v. Baca*, 1997-NMSC-018, ¶ 15, 123 N.M. 124, 934 P.2d 1053 (internal quotation marks and citation omitted). We

test sufficiency of the evidence against the jury instructions. *Holt*, 2016-NMSC-011, ¶ 20 ("The jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (alterations, internal quotation marks, and citation omitted)).

**{17}** In order to find Defendant guilty of second-degree embezzlement, the State had to prove beyond a reasonable doubt that:

>      1.      [D]efendant was entrusted with money with a value over $20,000;
>
>      2.      [D]efendant converted this money to [his] own use. 'Converting something to one's own use' means keeping another's property rather than returning it, or using another's property for one's own purpose rather than for the purpose authorized by the owner;
>
>      3.      At the time [D]efendant converted the money, [D]efendant fraudulently intended to deprive the owner of the owner's property. 'Fraudulently intended' means intended to deceive or cheat;
>
>      4.      This happened in New Mexico between September, 2010 and July, 2013.

*See* UJI 14-1641 NMRA; *see also* Section 30-16-8(A), (F).

## B.      Entrustment of Another's Property and Conversion

**{18}** The State's theory of embezzlement was that Defendant converted the monthly and lump sum payments he received under the second contract to his own use. "One cannot be guilty of embezzlement if he converts his own property; the property converted must be that 'of another.' " 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.6(d), at 130 (3d ed. 2018); *see State v. Earp*, 2014-NMCA-059, ¶ 15, 326 P.3d 491 ("Because embezzlement necessarily requires the conversion of the property of another, a defendant cannot be guilty of embezzlement with respect to property owned jointly by him, or in which he has an interest." (alterations, internal quotation marks, and citation omitted)). Thus, the State theorized at trial that the monthly and lump sum payments were not Defendant's property. Instead, the State argued that Purchasers and Defendant agreed these monies would be used to pay the Chase mortgage, thereby reserving some interest in these monies in the Purchasers even after the payments were submitted to Defendant. *See* 3 LaFave, *supra*, § 19.6(d), at 131-32 ("So too a building contractor who receives from the landowner an advance payment on the contract and who thereafter spends the money for his own purposes and does not fulfill the contract, is not guilty of embezzlement, unless the money is earmarked to be used only for a construction purpose." (footnotes omitted)); *see also State v. Kovach*, 2006-NMCA-122, ¶ 9, 140 N.M. 430, 143 P.3d 192 (" 'Entrustment' occurs when property is

committed or surrendered to another with a certain confidence regarding the care, use, or disposal of that property." (emphasis, internal quotation marks, and citation omitted)).

## 1.    Lump Sum Payments

**{19}**    As noted, upon negotiation of the second contract, the parties agreed that Purchasers would pay Defendant a lump sum payment of $20,000, Purchasers would make smaller lump sum payments and continue to make monthly payments to Defendant of around $500 until the lump sum payment was complete, and upon full payment of the lump sum, Purchasers would assume the Chase mortgage (which had an outstanding obligation of $41,360 at the time) and their monthly payments would be reduced to $317.71. Thus, Purchasers' overall debt to Defendant would be reduced from approximately $91,000 owed under the first contract to approximately $61,000 owed under the second contract.

**{20}**    With respect to the lump sum payment, both Ms. Samaniego and Mr. Zamora testified that they were told by Defendant that the $20,000 would be used by him to deal with a problem in Texas. Mr. Zamora further testified about the benefit to Purchasers of paying the $20,000:

> To me, it was so that I can pay off my house sooner, [Defendant] was giving us the option of giving him a lump sum or more money up front, and then it would have brought *my home mortgage* down. It was like 90,000 [the original amount on the first contract], and I would only have been left with whatever was on the note, which was about 43, and then plus the 20, it would have been only 60 that I would have had to pay for the house.

(Emphasis added.) It is evident from this testimony that Mr. Zamora understood the $20,000 lump sum was consideration for Defendant lowering the total amount owed from around $90,000 to around $60,000. Nonetheless, in support of the theory that the $20,000 was instead meant to be applied toward the Chase mortgage (as opposed to lowering the purchase amount of the Property), the State relies on Mr. Zamora's further testimony:

> Q.    [W]hat did you use that [$6,000 tax] credit and that refund for? What purpose?
>
> A.    Toward *our* mortgage. We gave [Defendant] the whole 6,000 that time. We gave him all our taxes. That way, we could own our house.
>
> Q.    Okay. Now, do you recall having any specific conversation with him about the $6,000 being used to go toward the mortgage, or was that your belief at the time?
>
> A.    No, I had a conversation with him, and everything was supposed to go—everything that we were paying him was supposed to go

to the mortgage. To my understanding, that's what he was telling me, that, [t]his is going toward *your* mortgage. Once you get the 20,000, I'm going to go ahead and sign it over. Your payments will go down, everything else.

(Emphasis added.) The State takes one phrase—"everything that we were paying him was supposed to go to *the mortgage*"—out of context to argue that the $20,000 in lump sum payments were supposed to be applied to the Chase mortgage. Mr. Zamora, however, does not identify "the mortgage" as the Chase mortgage; and, as indicated above, Mr. Zamora referred to the amount the Purchasers owed under the first contract as his "mortgage." When read in context and in light of all the other evidence as set forth above, the inference the State seeks to draw—that Mr. Zamora's reference to "the mortgage" was to the Chase mortgage—is not a reasonable one upon which the jury could rely. *See Rojo*, 1999-NMSC-001, ¶ 19; *Baca*, 1997-NMSC-018, ¶ 15. As such, there is insufficient evidence to support a finding by the jury that Purchasers entrusted the lump sum payments they made to Defendant to pay the Chase mortgage.

## 2. Monthly Payments

**{21}** As for the monthly payments, as noted, Purchasers understood from the contracts and conversations with Defendant that their payments would be used to pay the Chase mortgage. This understanding was supported by conversations between Defendant and Mr. Zamora, who testified as follows:

> Q. Did you ever have any specific conversations with [D]efendant about him taking your payments and paying the mortgage company, if you remember?
>
> A. Yes, we did talk about it, and he said that he was going to pay for the note, and it was included, the insurance and everything else, because I asked about the insurance, if we need to get insurance for our property. He said, No, that's included in the payment for the note for everything else.

Viewing the evidence in the light most favorable to the verdict, we conclude there was sufficient evidence that the Purchasers' monthly payments were entrusted to Defendant to pay the Chase mortgage payments. *See Kovach*, 2006-NMCA-122, ¶ 9. The State, however, presented scant evidence of conversion. The State offered the foreclosure complaint alleging Defendant missed certain Chase mortgage payments beginning in December 2012, while the Purchasers continued to make payments through June 2013 totaling $3,600 including late fees. Defendant, however, presented uncontroverted evidence that he made payments to Chase in December 2012 ($430), January 2013 ($420), and March 2013 ($850), totaling $1,700. Mr. Zamora testified that Defendant explained that the missed monthly payments to the Chase mortgage were used to deal with the problem in Texas. Based on the foregoing, and viewing the evidence in the light most favorable to the verdict, we conclude that the State offered proof that Defendant converted less than $2,500, but more than $500.

## C.    Fraudulent Intent

**{22}**    We next address whether the evidence is sufficient to allow a reasonable jury to conclude that Defendant failed to make certain monthly Chase mortgage payments with fraudulent intent to deprive Purchasers of their money. " 'Fraudulent intent' is defined as the intent to cheat or deceive and may be inferred by reasonable inferences and circumstantial evidence." *State v. Curry*, 2002-NMCA-092, ¶ 11, 132 N.M. 602, 52 P.3d 974. "The element of intent is seldom susceptible to direct proof and accordingly may be proved by circumstantial evidence." *State v. Dowling*, 2011-NMSC-016, ¶ 22, 150 N.M. 110, 257 P.3d 930 (alteration, internal quotation marks, and citation omitted). Intent "must be proved by the reasonable inferences shown by the evidence and the surrounding circumstances. If there are reasonable inferences and sufficient circumstances then the issue of intent becomes a question of fact for the jury. It is only where there is no reasonable inferences or sufficient surrounding circumstances that we can say, as a matter of law, that . . . a charge should not have been presented to the jury." *State v. Ortiz*, 1977-NMCA-036, ¶ 9, 90 N.M. 319, 563 P.2d 113. "We do not reweigh the evidence or substitute our judgment for that of the fact[-]finder as long as there is sufficient evidence to support the verdict." *State v. Pitner*, 2016-NMCA-102, ¶ 6, 385 P.3d 665 (internal quotation marks and citation omitted).

**{23}**    Looking at the evidence in the light most favorable to the verdict and declining to substitute our own evaluation of the evidence for the jury's, we conclude that the evidence of fraudulent intent is sufficient. A jury could reasonably find that Defendant deprived Purchasers of their Property with the requisite intent to deceive or cheat. The State presented evidence that Defendant told Purchasers he was going to use the money received from Purchasers' monthly payments to make the Chase mortgage payments, that he did not make multiple payments on the Chase mortgage, and that he did not reveal that he had used the Purchasers' monthly payments to deal with his problem in Texas until Purchasers confronted him with the foreclosure notice. A jury could reasonably infer from this evidence that Defendant surreptitiously used Purchasers' payments for his own purposes. Such an interpretation of the evidence supports a finding that Defendant acted with the intent to fraudulently deprive Purchasers of the monthly payments. *See State v. Archie*, 1997-NMCA-058, ¶ 10, 123 N.M. 503, 943 P.2d 537 (holding that evidence of fraudulent intent was sufficient to support embezzlement conviction of the defendant who surreptitiously treated property that did not belong to him in a manner contrary to the defendant's promises to the owner). We recognize that it is possible to interpret the evidence differently and conclude that Defendant did not have the requisite intent. But our task is not to second-guess a reasonable interpretation or substitute our own interpretation of the evidence for the jury's. *See Pitner*, 2016-NMCA-102, ¶ 6. Under our highly deferential standard of review, the evidence of intent is sufficient.

**{24}**    We conclude that the evidence of conversion of Purchasers' monthly payments is insufficient to support Defendant's second-degree embezzlement conviction but sufficient to support fourth-degree embezzlement. Accordingly, we reverse and remand with instructions for the district court to vacate Defendant's conviction and enter

judgment against Defendant for fourth-degree embezzlement, a lesser included offense on which the jury was instructed. *See State v. Villa*, 2004-NMSC-031, ¶ 11, 136 N.M. 367, 98 P.3d 1017 (recognizing that an appellate court that has vacated a conviction for insufficient evidence may remand for entry of judgment on a lesser included offense only if the jury received instructions on the lesser included offense).

**CONCLUSION**

**{25}** For the aforementioned reasons, we reverse Defendant's conviction for second-degree embezzlement and remand for the district court to enter judgment against Defendant for fourth-degree embezzlement.

**{26}** **IT IS SO ORDERED.**

**M. MONICA ZAMORA, Chief Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**ZACHARY A. IVES, Judge**